**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DEBORAH L. SARAGINO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 12-138-LPS-CJB |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff Deborah L. Saragino ("Saragino" or "Plaintiff") appeals from the decision of

Defendant Carolyn W. Colvin, the Commissioner of Social Security ("Commissioner" or

"Defendant"), denying her claim for disability insurance benefits ("DIB") under Title II of the

Social Security Act, 42 U.S.C. §§ 401-33.[1] The Court has jurisdiction over the matter pursuant

to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by

Saragino and the Commissioner. (D.I. 11, 13) For the reasons set forth below, the Court

recommends that Saragino's motion for summary judgment be GRANTED-IN-PART, that the

Commissioner's motion for summary judgment be DENIED, and that the case be remanded for

further proceedings consistent with this Report and Recommendation.

## I.    BACKGROUND

### A.    Procedural History

---

[1]    Carolyn W. Colvin became the Commissioner of Social Security on February 13,
2013 after this case was initially filed. Pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure, Ms. Colvin replaced the previous Commissioner, Michael J. Astrue, as the Defendant
in this case. *See, e.g.*, *Malcom v. Colvin*, 971 F. Supp. 2d 446, 448 n.1 (D. Del. 2013).

Saragino filed an application for Disability Insurance Benefits ("DIB") on January 5, 2007, alleging disability beginning on September 5, 2005. (D.I. 5, 6 (hereinafter "Tr.") at 17, 74-76)[2] Her claimed period of disability runs through June 30, 2011, the date she was last insured for disability benefits. (*Id.* at 19)

Saragino's application was denied initially on February 13, 2008, and was again denied on reconsideration on April 21, 2009. (*Id.* at 41-44, 46-50) On April 29, 2009, Saragino next filed a request for a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 51-52) Saragino was represented by counsel at the hearing, which was held on March 11, 2010, via video teleconferencing. (*Id.* at 799-832) On April 26, 2010, the ALJ issued a decision denying Saragino's claim for DIB. (*Id.* at 14-36) On April 29, 2010, Saragino requested review of the ALJ's decision by the Appeals Council. (*Id.* at 13) The Appeals Council denied Saragino's request for review on December 7, 2011. (*Id.* at 7-10) Thus, the ALJ's decision denying DIB became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

On February 6, 2012, Saragino filed a Complaint in this Court seeking judicial review of the ALJ's decision. (D.I. 1) On July 3, 2012, Saragino filed her motion for summary judgment. (D.I. 11) The Commissioner opposed Saragino's motion and filed a cross-motion for summary judgment on July 31, 2012. (D.I. 13) On July 10, 2013, Chief Judge Leonard P. Stark referred this case to the Court to hear and resolve all pretrial matters, up to and including the resolution of

---

[2]     The transcript in this case is lengthy and includes volume 1 (located at D.I. 5 on the docket) and volume 2 (located at D.I. 6 on the docket). The transcript is continuously paginated, however, and so the Court will simply refer to it as "Tr.," regardless of whether the citation in question is to volume 1 or volume 2.

case dispositive motions. (D.I. 17)

**B.  Factual Background**

Plaintiff Saragino was 31 years old at the time of the alleged onset of her disability in
September 2005, and 35 years old at the time of the ALJ's decision. (Tr. at 74, 77, 111) She is
married and lives with her husband and her three children. (*Id.* at 805) Saragino completed high
school and attended some college, and has past work experience as, *inter alia*, a credit analyst
and pharmacy technician. (*Id.* at 92-102, 109, 805-08)

**1.  Plaintiff's Medical History, Treatment, and Condition**

Saragino alleges she has been disabled and unable to work since September 5, 2005 due
to reflex sympathetic dystrophy ("RSD"), neuropathy in both legs, arthritis, depression, anxiety,
restless leg syndrome, migraines, and chronic fatigue. (*Id.* at 100) Saragino is also obese,
standing 63 inches tall and weighing between 183 and 219 pounds since her alleged onset date.
(*Id.* at 419, 470, 479, 718, 773)

**a.  Medical evidence prior to Saragino's alleged onset date**

Saragino has experienced problems with her knees since at least 1989, when she first
visited First State Orthopaedics ("First State"), complaining of a painful right knee that had been
kicked in taekwondo class. (*Id.* at 499, 501) In 1992, Saragino underwent knee surgery, (*id.* at
181), which appears to have been a right knee arthroscopy, (*id.* at 497). In July 1993, Saragino
visited First State for a right foot injury sustained when her right knee gave out as she was going
down stairs. (*Id.* at 498) She returned there to William Newcomb, M.D. in May 1996 for left
knee pain and burning, reporting a fall on the ice during the winter, and was diagnosed with
RSD. (*Id.* at 493-94) In July 1997, she visited Dr. Newcomb following an assault by her then-

husband, during which she fell on concrete on both knees. (*Id.* at 75, 491) She also reported that her left knee had recently gone out, injuring her ankle. (*Id.* at 491) X-rays of her knee and ankle were normal. (*Id.*)

On April 16, 2001, Saragino returned to First State to see Dr. Randeep S. Kahlon, citing swelling, pain, stiffness and loss of range of motion in her left index finger and pain in her back and almost every major joint. (*Id.* at 482-87) Dr. Kahlon's assessment was "[b]ilateral asymmetrical small joint arthritis with left index PIP chronic swelling." (*Id.*) A subsequent bone scan of her wrists and hands showed focal intense activity in the proximal interphalangeal joint of the left index finger, which could have been due to degenerative arthritis and trauma. (*Id.* at 157)

In May 2001, Saragino returned for a significant right knee effusion which had already been aspirated once by Dr. Khaja Yezdani, her primary care physician, and an onset of left knee effusion. (*Id.* at 481) Dr. Kahlon's assessment was "[m]ultiple asymmetrical large and small joint arthritis, possibly psoriatic arthritis." (*Id.*) The same day, Saragino began seeing arthritis and rheumatology specialist Sheerin Javed, M.D. Saragino arrived with a crutch, reporting a 9-month history of swollen joints beginning with her right index finger, and explaining that the arthritis had progressed to her wrists, knees and elbows. (*Id.* at 706-07) Dr. Javed's diagnosis was psoriatic arthritis manifested as asymmetrical synovitis, nail changes and elevated sedimentation rate and low back pain (most likely due to sacrolitis, secondary to the arthritis). (*Id.* at 707)

Saragino became pregnant with her third child in 2003 and complained of migraines during a few pregnancy-related doctor's visits. (*Id.* at 167, 169)

4

### b. Medical evidence subsequent to Saragino's alleged onset date

#### (1) 2005-2006

On September 19, 2005, Saragino experienced pain and numbness in her hands for several weeks which prevented her from working. She underwent an electromyographic study ("EMG") of her upper extremities which showed mild right carpal tunnel. (*Id.* at 205-06)

On November 15, 2005, Saragino began treating at Mid-Atlantic Spine, where she most frequently sees Frank J.E. Falco, M.D. She initially complained of constant pain (a 7-8 on a scale of 1-10) in her wrists, knees, feet, hips, neck and back. (*Id.* at 320) Medication helped "a little" while housework, sitting, standing, and laying in one position too long worsened the pain. (*Id.*)

On November 19, 2005, Saragino underwent an MRI of her lumbar spine due to lower back pain that radiated to both legs. (*Id.* at 464) The MRI showed minimal to mild disc bulges at the L4-S1 levels with mild facet arthropathy but no significant stenosis and no evidence of disc herniation. (*Id.*) Saragino was seen again at Mid-Atlantic Spine on November 22, 2005, and nurse practitioner Barbara Berkowich's impressions were chronic pain syndrome, depression, mild disc bulges in the lumbar spine, diffuse joint pain and myofascial pain. (*Id.* at 319) Nurse Berkowich recommended medications, a urine drug screen, an EMG of the lumbar spine, wrist, knee, hip and neck x-rays, and a psychiatric evaluation due to Saragino's depression, but indicated that Saragino refused to comply with that plan of care. (*Id.* at 319, 334)

On December 8, 2005, Saragino underwent an EMG of her lower extremities to evaluate her pain and weakness in both legs; the results were normal. (*Id.* at 204) On December 29, 2005, Saragino saw David T. Sowa, M.D. at First State for arthritic pain and stiffness in her

hands and numbness in her bilateral upper extremities. (*Id.* at 480) She noted that she had recently fallen down and up steps. (*Id.* at 479) Dr. Sowa conducted a physical examination, reporting slight irritability over the median nerve of the right wrist. (*Id.*) He injected her right wrist to treat her "mild" right carpal tunnel syndrome, recommended use of a cock-up wrist splint and told Saragino to follow up with a rheumatologist (as he suspected that her psoriatic arthritis had flared up). (*Id.*) Saragino called back a few days later, on January 6, 2006, requesting a "note for work[,]" which a physician at First State provided. (*Id.* at 480)

Saragino returned to Mid-Atlantic Spine on January 9, 2006, reporting recent falls due to both legs giving out. (*Id.* at 328) She reported constant pain (an 8-9 on a scale of 1-10) in both knees, wrists and ankles and her mid to lower back that increased with everyday activities and improved with rest. (*Id.*) At a January 22, 2006 visit, she reported swelling in her left leg and was told to visit a neurologist and rheumatologist. (*Id.* at 323-24)

On February 2, 2006, Saragino returned to Dr. Javed due to swelling in her left leg, an inflamed Baker's cyst, low back discomfort, and stiff hands. (*Id.* at 341) His impressions included inflammatory arthritis and possible psoriatic arthritis, and he recommended ultrasound and doppler studies of the left leg. (*Id.* at 341-42) Several days later, during a gynecological examination, Saragino indicated that she could not take care of her children and that she had a recently ruptured Baker's cyst and RSD. (*Id.* at 377)

On February 17, 2006, Saragino returned to Dr. Javed, complaining of pain throughout her body. (*Id.* at 340) She reported a February 9 visit to the emergency room for treatment for her ruptured Baker's cyst and a bad migraine. (*Id.*; *see also id.* at 316) A physical examination revealed a tender, red left calf, tenderness on palpation across her hands, and bilateral

6

trochanteric bursitis. (*Id.* at 340) Dr. Javed recommended weekly Enbrel injections. (*Id.*)

Between February and May of 2006, Saragino continued with her regular visits to Mid-Atlantic Spine. She most often reported constant pain (which she generally ranked between 7-10 on a scale of 1-10) in her wrists, knees, back and neck, (*see id.* at 299, 308, 316), and added during some visits that she was experiencing pain in her left shoulder, hips, wrists, elbows, fingers, ankles, feet and toes as well, (*id.* at 282, 286, 289, 295, 312). She indicated during these visits that her pain improved with rest and while seated in a recliner with her legs elevated. (*Id.* at 269, 282, 286, 295, 299, 308, 312) By May 31, 2006, she was reporting constant pain in her "whole body" and a recent fall on her "left knee again[,]" while stating that she rarely left her home. (*Id.* at 269) On March 15, April 3, and April 17, 2006, Saragino received lumbar epidural injections at Mid-Atlantic Spine for her L-5 radiculopathy, (*id.* at 294, 302, 305-08), and on May 15, 2006, she received a left lumbar sympathetic block, (*id.* at 272).

On May 10, 2006, Saragino underwent an EMG by Dr. Falco which was abnormal, with electrodiagnostic findings for right L5 motor radiculopathy suggestive of left L5-S1 motor radiculopathy, but with those findings being inconclusive. (*Id.* at 275-81) On May 17, 2006, she underwent x-rays of her left foot and left lower leg that were normal. (*Id.* at 185)

On May 18, 2006, Saragino visited Dr. Yezdani, complaining of increased anxiety and depression and reporting that the Paxil she had been taking since 2002 was not working. (*Id.* at 530)[3] Dr. Falco performed x-rays of her knees and left wrist on June 12, 2006 which were normal (*Id.* at 266-67) A week later, Dr. Falco administered an EMG of her upper extremities

---

[3]     Saragino had multiple check-ups with Dr. Yezdani over the course of the relevant time period. (*Id.* at 506-37, 710-18) His notes are handwritten and are difficult to read. (*Id.*)

which was normal. (*Id.* at 255-62)

On June 26, 2006, Saragino visited Mid-Atlantic Spine complaining of severe pain throughout her body. (*Id.* at 252) The medications Saragino was taking by this time included SA morphine, oxycodone, Wellbutrin, neurontin, Paxil, Clonopin, Ambian, Premarin, and Cymbalta. (*Id.* at 254) During a July 12, 2006 visit, she received a right lumbar sympathetic block from Dr. Falco. (*Id.* at 245-47) She reported that she had recently sought treatment for her left knee at the Medical Aid Unit. (*Id.* at 248) At follow-up on July 24, 2006, the noted impressions included RSD in Saragino's legs and left lower extremity, chronic low back pain, pain in her left wrist and left knee, and history of "patella femoral[.]" (*Id.* at 241)

On August 7, 2006, Saragino received a left lumbar sympathetic block from Dr. Falco. (*Id.* at 235) She returned to Mid-Atlantic Spine for follow up visits on August 16, 2006 and August 21, 2006, noting during the latter visit that her history of carpal tunnel and increased bilateral wrist pain and numbness caused her to drop things. (*Id.* at 228, 232)

On September 9, 2006, Saragino reported to the emergency room at Christiana Hospital with a fever and a boil on her chest, for which she underwent surgery the next week. (*Id.* at 181) In the course of her stay, on September 16, 2006, she had an orthopedic consultation with Eric Johnson, M.D., during which she complained of bilateral knee pain and swelling in her right knee. (*Id.* at 181-82) Saragino described a "long history" of bilateral knee pain and knee problems, including frequent falls while attempting to go up and down stairs and when "standing in the middle of a room without support." (*Id.*) She reported that she was using "a cane to help with mobility" but that it was "not a dependable reliance" and that she had limited mobility at

home. (*Id.*)[4] Dr. Johnson performed a physical examination, and noted tenderness to palpation to a greater extent in the right knee and associated with a range of motion, ninety degrees of flexion, zero degrees of extension, a mildly crepitant patella femoral joint with lateral tracking and weakness of the quadriceps. (*Id.* at 183) He reported no remarkable findings with respect to a McMurray's test (a test to evaluate possible tears in the meniscus of the knee), because Saragino had pain throughout the entire arch of motion, arch of rotation, and with any manipulations of her extremity. (*Id.*) Dr. Johnson's impression was degenerative joint disease of the knee; due to his "concerns about [Saragino's] overall level of mobility and strength[,]" he advised her to begin physical therapy. (*Id.* at 183-84)

Saragino returned to Mid-Atlantic Spine on September 27, 2006 and October 26, 2006. During these visits, she complained of constant pain (at a 9 or 10 on a scale of 1-10) in her knees, wrists, feet and back. (*Id.* at 220, 224)

From November 15-20, 2006, Saragino was hospitalized for swelling of her left lower knee joint and left lower extremity. (*Id.* at 209-10) A CT scan of her left lower extremity showed a multilobulated, recently partially ruptured Baker's cyst. (*Id.* at 214) An MRI of her left knee showed the cyst, subcutaneous edema along the lateral aspect of the knee (possibly cellulitis), no evidence of internal derangement, and nodular soft tissues, likely synovial chondromatosis. (*Id.* at 212-13) The hospital discharge summary listed Saragino's numerous daily medications, including Paxil, Premarin, Xanax, Wellbutrin, Nexium, Cymbalta, Lyrica, Ambien, Zanaflex, Maxzide, Promethazine, an albuterol inhaler, Enbrel, and a fentanyl patch.

---

[4] In a 2009 Function Report, Saragino stated that Dr. Yezdani prescribed a cane and crutches for her in approximately 2001 or 2002. (Tr. at 151) This prescription is not a part of the record.

9

(*Id.* at 209)

On November 22, 2006, Saragino returned to Mid-Atlantic Spine complaining of constant pain in her knees, wrists, legs, feet and fingers that increased with normal activity and improved with rest and elevation. (*Id.* at 217) She visited Dr. Javed on November 28, 2006 for left knee pain. (*Id.* at 338) A physical examination revealed, *inter alia*, periarticular swelling around the left knee, and Dr. Javed's impressions included psoriatic arthritis, painful knee and anxiety; he told Saragino to resume using Enbrel. (*Id.*) On December 20, 2006, Saragino returned to Dr. Falco, reporting continued knee pain and falls. (*Id.* at 666) He observed that Saragino "walks with crutches" and that her gait was coordinated and smooth antalgic. (*Id.* at 667) He also noted that Saragino's "[m]uscle strength normal (5 out of 5) in both upper and lower extremities decreased in upper and lower extremities."[5] (*Id.*) He adjusted her medication. (*Id.*)

### (2)    2007

Saragino visited Dr. Yezdani's office on January 4, 2007, complaining of an anxiety attack and increased muscle spasms. (*Id.* at 524) She reported a December 5, 2006 emergency room visit for a migraine attack. (*Id.*) Saragino also saw Dr. Falco on January 17, 2007, and reported that a recent MRI of her knee showed cartilage disruption but no tear. (*Id.* at 664-65)

On February 13, 2007, Saragino visited Dr. Johnson at First State regarding her chronic knee pain. (*Id.* at 473) Dr. Johnson indicated that Saragino used a cane intermittently and experienced multiple falls. (*Id.*) Saragino recounted a recent incident when she was walking her children to the bus stop without her cane and her ankle buckled, her knee gave out, and she

---

[5]    Dr. Falco consistently ranked Saragino's muscle tone as a 5 out of 5 in every subsequent office note that includes a section relating to that topic. (*See generally* Tr. at 550-665, 710-42)

landed on her right side and rolled to her back. (*Id.*) Saragino ranked her left knee pain as a 10 on a scale of 1-10, and the rest of her pain as a 7 or 8; she noted that rest and elevation caused relief. (*Id.* at 473, 475) Further, Saragino reported that her pain caused difficulty while playing with her children and prevented her from doing housework, standing for long periods of time, and using the basement steps. (*Id.* at 473-74) Dr. Johnson's physical examination revealed a moderate effusion about the knee, range of movement from 90 degrees of flexion, zero degrees of extension, and sensitivity at the anterior aspect of the knee associated with any range of motion. (*Id.* at 474) His review of her November 2006 MRI of the knee and lower extremity "indicate[d] no remarkable findings, no significant internal pathology, and no other problems." (*Id.*) He recommended injections, activity modification, and a strengthening program. (*Id.*)

Saragino returned to Dr. Javed on February 28, 2007, for a swollen, sore left knee, limping and using a cane. (*Id.* at 336) On examination, Dr. Javed noted suprapatellar bursitis and effusion in the left knee; Saragino also complained of pain in the thumbs and a few metacarpophalangeal joints on palpation. He aspirated the left knee, obtaining 5 cc's of fluid. (*Id.*)

On March 12, 2007, Saragino appeared at MeadowWood Behavioral Health System ("MeadowWood") barefoot and feeling "totally overwhelmed" due to marital troubles. (*Id.* at 343, 349) She also described "longstanding problems with anxiety [and] depression complicated by chronic pain." (*Id.* at 343) She was admitted to the facility with a global assessment of functioning ("GAF") score of 40. (*Id.* at 344, 367) Saragino described having a history of problems ambulating and stated that she used a cane. (*Id.* at 351) Saragino was discharged on March 15, 2007 with a GAF of 50, determined to work out her marital issues. (*Id.* at 345)

11

On March 26, 2007, Saragino visited Mid-Atlantic Spine for knee pain and severe right arm pain caused by an altercation. (*Id.* at 662) At follow-up a month later, her right shoulder had improved. (*Id.* at 660)

On March 27, 2007, Saragino had an initial evaluation at Harmonious Mind Counseling & Psychiatric Services. (*Id.* at 368-75) She reported that her husband was back at the marital home following a one-week separation. (*Id.* at 368) She disclosed feelings of distress due to her inability to work. (*Id.*) Her GAF score was 50. (*Id.* at 369) A follow-up visit was scheduled for April 4, 2007, (*id.* at 371), but there are no additional mental health notes. Saragino returned to Dr. Falco on May 21, 2007 and June 20, 2007, and requested medication adjustments which Dr. Falco accommodated. (*Id.* at 655-59)

On July 10, 2007, Saragino was involved in a motor vehicle accident, prompting a visit to the emergency room at Christiana Hospital for a headache and pain in her neck, back, stomach and left leg. (*Id.* at 390, 394, 398, 401) A physical examination revealed contusions on her chest, abdomen, left knee and ankle. (*Id.* at 394) X-rays of her left ankle, cervical spine, chest and left knee showed no fractures, though her left knee x-ray showed a mild suprapatellar joint effusion. (*Id.* at 402-06) She was given Soma for muscle spasms and Percocet for pain, instructed to follow up with Dr. Falco, and discharged. (*Id.* at 392, 398) She ambulated without difficulty. (*Id.* at 398-99)

That day, and again on July 12, 2007, Saragino visited Dr. Yezdani, complaining of back pain, left knee pain, and hip pain. (*Id.* at 516-17) During the latter visit, Dr. Yezdani prescribed a wheelchair. (*Id.* at 414-16) Later, on August 2, 2007, he issued a letter explaining that Saragino's auto accident "resulted in pain in her lower and upper back, neck, left shoulder and

arm and headaches" and "also caused increased leg pain and weakness, which has confined her to a wheel chair." (*Id.* at 513) The letter indicated that Saragino required physical therapy two or three times per week[6] and was unable to care for her children on her own due to being in a wheelchair. (*Id.*)

On July 18, 2007, Saragino returned to Dr. Falco, using her wheelchair and complaining of increased pain that medication was not helping. (*Id.* at 652) Her husband was on leave from the Army to help out at home. (*Id.*) Dr. Falco noted that Saragino "walks with crutches."[7] (*Id.* at 653) She returned on July 23, 2007, reporting increased pain in her left knee, back, neck, left shoulder and arm, a headache, bilateral hip pain with radiating pain down her left leg and foot, bilateral wrist pain and diffuse muscle stiffness. (*Id.* at 646) Dr. Falco took a CT scan of the cervical spine that showed: (1) tiny C2/3, C3/4 and C4/5 disc protrusions; (2) C5/6 and C6/7 central and left paracentral disc protrusions; (3) C3/4 to C6/7 facet arthropathy; (4) generalized disc space narrowing; (5) loss of cervical lordosis with straightening of cervical spine; and (6) no central canal stenosis. (*Id.* at 651) A left shoulder x-ray was normal. (*Id.* at 650)

Saragino again returned to Dr. Falco twice in August and twice in September, complaining of increased pain in her neck, left arm and shoulder, back and left knee, burning in her right knee, and difficulty sleeping. (*Id.* at 637, 639, 641, 643) At her September 12, 2007 visit, she complained of a headache different in nature from her usual migraines, and reported

---

[6]    The record does not contain any physical therapy notes.

[7]    In the vast majority of subsequent office notes regarding Saragino's visits, Dr. Falco either noted "patient using wheelchair" or "walks with crutches," sometimes recording the latter even when stating elsewhere in the same note that Saragino "present[ed] in a wheelchair." (*See generally id.* at 550-665, 710-42)

that her medication was becoming less effective, relieving her pain by 30-40 percent. (*Id.* at 639) Dr. Falco made some adjustments to her medication. (*Id.* at 638)

On October 3, 2007, Saragino underwent an EMG of her left upper extremity that was abnormal, revealing left C6 motor radiculopathy. (*Id.* at 625-26, 635-36) She returned to Dr. Falco a week later with low back and knee pain. (*Id.* at 632) Saragino was using her wheelchair and reported that her pain increased with ambulation. (*Id.*) She requested some medication adjustments which Dr. Falco approved. (*Id.* at 632-33) Saragino's condition was the same at an October 24, 2007 visit, with Dr. Falco noting that her right leg RSD symptoms have worsened significantly since the motor vehicle accident. (*Id.* at 630) Pursuant to his recommendations, she received cervical epidural and right lumbar sympathetic nerve blocks in November 2007; the former provided her with significant relief from pain for more than one week. (*Id.* at 618-19, 622, 629, 631) In between those treatments, on November 12, 2007, Saragino returned to Dr. Falco, complaining of increased pain and instability with ambulation. (*Id.* at 627)

At a November 21, 2007 visit, Saragino complained of increased pain and swelling in her knees, with the left knee worse than the right, and reported a fall the previous week while attempting to get out of her recliner. (*Id.* at 622) Dr. Falco opined that Saragino's July 2007 motor vehicle accident had caused increased bilateral leg and knee pain. (*Id.*) On examination, he noted "[p]atella positive pain and mild swelling right lateral patella . . . . [s]welling mild bilateral knee[s]" with swelling in the right knee greater than in the left. (*Id.* at 623) On December 10, 2007, she returned to Dr. Falco in her wheelchair and had her MS Contin dosage adjusted as it was making her tired. (*Id.* at 616)

On December 31, 2007, Dr. Irwin Lifrak performed a consultative examination for the

14

Delaware Disability Determination Service. (*Id.* at 417-25) Saragino's chief complaints were: (1) pain extending throughout her entire vertebral column from the cervical down through the lumbosacral spine, with further extension of the pain throughout both upper extremities and both lower extremities; (2) headaches; (3) emotional depression; and (4) abdominal discomfort. (*Id.* at 417) She required assistance in disrobing and getting dressed, and in getting on and off the examining table. (*Id.* at 419) During physical examination, Dr. Lifrak noted Saragino's inability to walk on her heels or toes, inability to perform maneuvers requiring dexterity with the left hand, reduced range of motion in the cervical spine and the shoulders, hips and knees, and sensory deficits in Saragino's right foot and left fingers. (*Id.* at 419-20) He was unable to assess range of motion in Saragino's lumbar spine as she was unable to stand. (*Id.* at 420) Dr. Lifrak's diagnoses were degenerative joint disease and probable disk damage, headaches that may be consistent with migraine-type headaches, emotional depression, and gastritis and possible peptic ulcer disease. (*Id.* at 420-21) He concluded that: (1) in an eight-hour work day, Saragino was "essentially wheelchair-bound"; (2) use of her right hand, although capable of dexterity, was limited to lifting weights of up to five pounds; and (3) use of her left hand was limited to lifting no more than one pound and was unable to perform maneuvers requiring dexterity. (*Id.* at 421)

### (3) 2008

On January 2, 2008, Saragino underwent a clinical psychological evaluation by Frederick Kurz, Ph.D. for the Delaware Disability Determination Service. (*Id.* at 426-32) Saragino explained that she was depressed as a result of her inability to engage in productive activities like work and childcare. (*Id.* at 426-27) Dr. Kurz noted her use of a wheelchair and no deficits in her fine motor skills. (*Id.*) He diagnosed adjustment disorder with anxiety and depressed features,

chronic pain disorder, arthritis, RSD, and migraines. (*Id.* at 428) Saragino's GAF score was 63. (*Id.*)

Saragino returned to Mid-Atlantic Spine on January 16, 2008, complaining of increased leg and knee pain and severe headaches since her July 2007 motor vehicle accident. (*Id.* at 613) On January 21, 2008, Saragino received a cervical epidural injection. (*Id.* at 611-12)

On February 13, 2008, Pedro Ferreira, Ph.D. completed a psychiatric review technique and mental residual functional capacity ("RFC") assessment, opining that from an emotional functioning point of view, Saragino "appears capable of simple, routine" work. (*Id.* at 433-46) On March 13, 2009, Douglas Fugate, Ph.D. affirmed these findings. (*Id.* at 537-48)

On February 14, 2008, Dr. R. Palandjian completed a physical RFC assessment based upon a review of medical records. (*Id.* at 447-53) Dr. Palandjian noted that Saragino's "wheelchair usage is not evident on all office visits and therefore may not be an absolute medical necessity." (*Id.* at 453) He also noted that Dr. Lifrak's examination conflicted with Dr. Falco's findings of "5/5" motor strength with normal muscle tone. (*Id.*) Dr. Palandjian opined that while it is "unlikely" that Saragino would be able to stand for 6 hours in an 8 hour day, "she should be capable of sedentary activity w[ith] hazard restrictions." (*Id.*)

Saragino returned to Mid-Atlantic Spine on March 5, 2008 and April 2, 2008, complaining of increased pain but reporting that her pain medications provided good relief. (*Id.* at 603-08) During the latter visit, she reported a recent fall that had caused increased knee pain. (*Id.* at 603) On April 9, 2008, Saragino visited Dr. Falco with increased pain in her right knee following a recent fall in her bathroom at home. (*Id.* at 599) She underwent an x-ray of her right knee that day which suggested a fibular head stress fracture, and she was referred for a bone

16

scan. (*Id.* at 599, 602) The April 17, 2008 bone scan was normal, however, showing no evidence of the previously-suggested fracture. (*Id.* at 178-80)

C. Obi Onyewu, M.D. of Mid-Atlantic Spine saw Saragino on May 28, 2008, noting the bone scan and her unchanged pain. (*Id.* at 596) On June 26, 2008, Saragino underwent MRIs of both knees at the request of Dr. Onyewu. (*Id.* at 460-61) Both MRIs revealed large effusions of the knee joints and extensive debris within the joint effusions and cysts. (*Id.*) The MRI of Saragino's left knee additionally showed a prominent popliteal cyst and evidence of meniscal tear, while the MRI of her right knee showed a mild popliteal cyst. (*Id.*)

Saragino returned to Dr. Falco on July 7, 2008, complaining of increased overall pain and continued swelling in her right knee. (*Id.* at 592) She explained that she had been doing more work around the house, and she described both knees, which would pop, click, grind and catch, as unstable. (*Id.*) Dr. Falco adjusted her pain medications because Saragino reported they were providing minimal relief. (*Id.*) An August 4, 2008 note was similar, with Dr. Falco noting that Saragino's medications were providing 30% relief and advising a cervical epidural steroid injection. (*Id.* at 589-91)

On July 21, 2008, Saragino returned to Dr. Newcomb at First State regarding both knees. (*Id.* at 466) She reported that she could not go up and down stairs. (*Id.* at 468) Dr. Newcomb wrote that Dr. Falco had "cleared up the right knee" but there was some RSD in her left knee, and that "[t]his goes back and forth." (*Id.* at 466) Dr. Newcomb aspirated her right knee, retrieving less than 5 cc's of fluid. (*id.*) He recommended a right knee arthroscopy, (*id.*), which he performed on August 27, 2008, (*id.* at 175).

On September 3, 2008, Saragino returned to Dr. Onyewu, reporting little improvement.

17

(*Id.* at 698) His physical examination revealed a painful range of motion in Saragino's neck, normal range of motion in her back, limited range of motion in her knees, and stable ambulation. (*Id.* at 699-700) The next day, Saragino saw Dr. Newcomb, who noted some puffiness about the right knee but only a small effusion, and good range of motion. (*Id.* at 465) He recommended avoiding aspiration as much as possible, and advised that she begin knee massage and a home exercise program. (*Id.*) Dr. Newcomb stated that Saragino had "complaints that are similar in the left knee," which could be addressed if the surgery resolved her right knee issues. (*Id.*)

Dr. Falco administered a cervical epidural injection to treat the radicular syndrome in Saragino's upper limbs on September 22, 2008. (*Id.* at 571-72, 581) Two days later, Saragino returned to Dr. Javed, complaining of pain in her joints, knees, wrists, hands, neck and back, and morning stiffness. (*Id.* at 701) Dr. Javed conducted a physical examination, and his assessment included inflammatory polyarthropathy, joint stiffness and obesity. (*Id.* at 702) He prescribed Enbrel and Naprosyn. (*Id.*)

Saragino returned to Mid-Atlantic Spine on September 29, 2008. (*Id.* at 575) She reported "feel[ing] well" following her surgery and "hop[ed] to schedule her left knee." (*Id.*) Dr. Irwin adjusted Saragino's medication to enable her to better care for her children. (*Id.* at 575, 580) An October 27, 2008 note by Dr. Falco was largely similar, with Saragino reporting increased overall pain because she had to "do 'more than usual around the house'" with her husband training for the Army. (*Id.* at 568-70) On November 10, 2008, Dr. Falco administered left C3-C7 facet nerve blocks, (*id.* at 573-74), and Saragino returned on November 24, 2008 due to continued pain and swelling in her left knee, (*id.* at 565). She reported that the nerve blocks had provided "50% neck and left arm pain relief lasting [for] 1 week[,]" and that her "pain

medication [gave] her good pain relief." (*Id.*)

Dr. Falco filled out a Physical RFC Questionnaire on November 24, 2008. In the RFC questionnaire, Dr. Falco reported that Saragino's symptoms included: (1) chronic low back pain; (2) chronic bilateral leg pain and weakness; (3) chronic bilateral knee pain; (4) chronic neck pain; (5) chronic left arm pain and numbness; (6) RSD in bilateral legs; and (7) fatigue as a side effect of her medications. (*Id.* at 502) He identified "MRI, EMG, [and] [b]one [s]can" as the clinical findings and objective signs for her conditions. (*Id.*) He also indicated that Saragino suffered from depression and anxiety. (*Id.* at 503) He opined that her symptoms were severe enough to constantly interfere with her ability to perform simple work tasks. (*Id.*) Dr. Falco stated that Saragino could not walk any city blocks without rest or severe pain, could sit and stand/walk for less than 2 hours total in an 8-hour working day with normal breaks, and should elevate her legs waist high with prolonged sitting. (*Id.* at 503-04) He also noted that Saragino was required to use a cane or other assistive device while engaging in occasional standing/walking. (*Id.* at 504) He opined that Saragino could rarely look down, turn her head right or left, look up, hold her head in a static position, twist, stoop/bend, or climb stairs, and that she could never crouch/squat or climb ladders, and had significant limitations with reaching, handling and fingering. (*Id.* at 504-05) Dr. Falco noted that these limitations had applied since September 2005, and that Saragino's current prognosis was "poor." (*Id.* at 502, 505)

### (4)    2009

Saragino returned to Dr. Falco just before January 2009, and again in that month, complaining of continued chronic pain, though reporting good relief from her pain medication. (*Id.* at 559-64) She received two left C3-C7 cervical facet nerve blocks in February 2009 to help

19

alleviate her neck and right arm pain. (*Id.* at 552-54, 557-58) Saragino again visited Dr. Falco on February 16, 2009, March 16, 2009, and April 13, 2009 with continued chronic pain. (*Id.* at 549-51, 555-56, 741-42) He recommended testing to evaluate for osteoporosis. (*Id.* at 741-42)

On April 8, 2009, state agency physician Michael Borek, D.O. completed a Physical RFC Assessment based on his review of the medical evidence. (*Id.* at 668-77) He opined that the evidence supported a sedentary RFC, but not Saragino's need for a wheelchair. (*Id.* at 671) In deeming Saragino "only partially credible," he pointed to the March 2007 MeadowWood Hospital records, noting that those records gave no indication that Saragino had an inability to walk or that she needed to use a wheelchair. (*Id.* at 675)

On April 21, 2009, Saragino had an initial consultation with rheumatologist Peter V. Rocca, M.D. (*Id.* at 708) She told him that her knees, wrists and fingers were the most currently affected areas. (*Id.*) Dr. Rocca noted that Saragino's range of motion in her upper extremity was normal, while she had limited flexion in her knees, cervical spine and lumbar spine. (*Id.*) He conducted a physical examination and reported that Saragino generally appeared uncomfortable, that she arrived in a wheelchair, and that she transferred with great difficulty. (*Id.*) Her gait and coordination, however, were listed as normal. (*Id.* at 709) His assessment was psoriatic arthritis and effusion of the bilateral knees. (*Id.*) Dr. Rocca wrote of Saragino that "[t]his is a most unfortunate woman" in that she "clearly has evidence of an inflammatory arthritis" involving her knees and "chronic pain issues[,]" though he believed her RSD diagnosis to be "tenuous." (*Id.*) He aspirated both knees, obtaining 12 cc's from her right knee and a trace of fluid from her left knee. (*Id.*)

On June 8, 2009, Saragino again visited Dr. Falco, complaining of increasing stiffness,

20

pain and swelling in her left knee following a recent fall. (*Id.* at 739) She told him that as a

result of the fall, she needed "to use her wheelchair more frequently." (*Id.*) Dr. Falco reviewed a

DEXA scan[8] of Saragino's knees which "indicated areas of osteopenia"[9] and recommended

calcium supplements. (*Id.* at 739-40) Saragino returned a month later, reporting the gradual

return of upper extremity dysesthesia. (*Id.* at 737) She indicated that she "uses wheelchair

ambulation for long distance traveling [and] otherwise uses cane ambulation." (*Id.*) Saragino

received a series of left lumbar sympathetic blocks in July and August 2009 which gave some

relief in her left leg. (*Id.* at 731, 734-36)

Saragino again returned to Dr. Falco on August 3, 2009, reporting a flare up of pain in her

fingers, wrist and right knee. (*Id.* at 732) Dr. Falco prescribed Enbrel at her request, (*id.* at 732-

33), and again adjusted her medication during an August 31, 2009 visit, (*id.* at 730). On

September 4, 2009, Dr. Yezdani filled out a form for Saragino's spouse's employer to allow him

medical leave as needed for Saragino's condition. (*Id.* at 714-16)

During September 28, 2009 and October 26, 2009 visits with Dr. Falco, Saragino

reported recent "frequent falls" caused by her right knee "'giv[ing] out[,]'" increased pain due to

the cold weather, and a rheumatoid arthritis flare. (*Id.* at 727-29) Dr. Falco prescribed Flector

patches for acute knee pain. (*Id.*) Saragino returned to Dr. Falco on November 23, 2009,

complaining of increased pain in her wrists and lower back while reporting improved lower

extremity symptoms following an adjustment to her Lyrica dosage. (*Id.* at 725) A December 21,

---

[8]     It does not appear that this DEXA scan is a part of the record.

[9]     This is a condition where bone mineral density is lower than normal. (D.I. 12 at 7)

2009 note was similar, with Saragino attributing increased pain of her wrists and left hand to rheumatoid arthritis and indicating that her rheumatologist could not help her. (*Id.* at 722) Dr. Falco prescribed a Medtrol dose taper to treat her joint pain. (*Id.* at 722-23)

### (5) 2010

Saragino returned to see Dr. Falco on January 18, 2010, reporting increased left shoulder pain and headaches. (*Id.* at 719) He prescribed Fioricet for her headaches and recommended left C3-C7 facet nerve blocks. (*Id.* at 719-20)

On February 5, 2010, Dr. Yezdani issued a report opining that Saragino suffered from Raynaud's Syndrome, migraines, arthritis and fatigue. (*Id.* at 743) He reported the following limitations: (1) an inability to walk more than 10 feet, while requiring a cane or a crutch to prevent her legs from giving out; (2) a wheelchair is required for distances farther than 10 feet; and (3) inability to stand for more than 5-10 minutes due to pain and weakness in her legs and lower back. (*Id.*) He wrote that she could use the cane with her right hand due to nerve damage in her left arm that caused pain and weakness. (*Id.*)

On February 8, 2010, Saragino had an initial consultation with rheumatologist Susan L. Cowdery, M.D. (*Id.* at 773-78) Her chief complaint was listed as "I can't walk" and additional complaints included pain throughout her body, swollen joints, and fatigue. (*Id.* at 773, 775) Dr. Cowdery noted that since 2007, Saragino was wheelchair dependent, but could walk 10 feet using a cane or crutch. (*Id.* at 773) Dr. Cowdery identified the following problems: (1) inflammatory polyarthritis; (2) psoriasis; (3) chronic pain syndrome; (4) herniated cervical disc; and (5) bilateral degenerative joint disease in the knees. (*Id.* at 777) Dr. Cowdery attempted to aspirate Saragino's left knee, but was unable to remove fluid, because, as Saragino stated, "[Dr.

Falco] said I need surgery to clean it out." (*Id.*) Dr. Cowdery ordered studies and blood tests to further assess Saragino's condition, (*id.*), which Saragino underwent, (*id.* at 757-58, 760-72). Saragino returned on February 23, 2010, continuing to complain of polyarticular pain and pain and swelling in her knees. (*Id.* at 754) Dr. Cowdery's diagnoses were rheumatoid arthritis, noting "[s]trongly positive CCP[,]" Sjogren's syndrome, vitamin D deficiency, and chronic pain syndrome. (*Id.* at 759) She prescribed calcium tablets, vitamin D, and Medrol. (*Id.*)

On March 8, 2010, Dr. Falco issued a similar letter to Dr. Yezdani's February 2010 letter. He indicated that Saragino was limited as follows: (1) she could walk with a cane for up to ten minutes, but thereafter required the use of a wheelchair to ambulate; (2) she could occasionally use stairs with the assistance of a cane and/or railing; (3) she must use her right hand when using a cane; (4) she was unable to lift more than five pounds; and (5) she could not do any overhead work, nor any squatting, kneeling, crawling, stooping or repetitive bending or twisting. (*Id.* at 744)

On March 10, 2010, Saragino visited Christiana Hospital for knee pain, rheumatoid arthritis, and RSD, and was prescribed Dilaudid for the pain. (*Id.* at 779-81) Two days later, Saragino returned to Dr. Cowdery and explained that Dr. Falco had tried unsuccessfully to aspirate her left knee, causing severe pain that had sent her to the hospital. (*Id.* at 748) She complained of pain in her knees and hips, stiffness in her joints and occasional low back pain due to sitting in her wheelchair. (*Id.*) Saragino reported that the "Vitamin D has helped her fatigue." (*Id.*) With respect to Saragino's level of function, Dr. Cowdery noted that Saragino uses a "wheelchair for travel and requires help" with activities of daily living. (*Id.*) Dr. Cowdery prescribed Enbrel injections and advised Saragino to follow up with her orthopedic doctor to

discuss a possible left knee arthroscopy. (*Id.* at 750-51)

## 2. The Administrative Hearing

At the administrative hearing on March 11, 2010, the ALJ heard the testimony of

Saragino and Adina Leviton ("Leviton"), an impartial Vocational Expert ("VE"). (Tr. at 799-

832)

### a. Plaintiff's Testimony

During the hearing, Saragino sat sideways in a wheelchair, explaining that it was painful

to look to her left. (*Id.* at 825) She kept her left arm on her lap to prevent it from falling asleep

due to nerve damage. (*Id.* at 826) She elevated her left foot on a chair because her knee was

swollen and it would otherwise throb. (*Id.* at 825-26)

With regard to her work history, Saragino testified that from 1996 through 2000, she

worked as a pharmacy technician, which required her to stand and walk most of the day and lift

up to 40 pounds. (*Id.* at 807) From roughly 2002 to 2005, she worked 20 hours per week as a

credit analyst. (*Id.* at 806; *see also id.* at 92-93) She explained that because of her migraines,

arthritis, and RSD, her physicians did not "feel comfortable" with her working beyond that. (*Id.*

at 824-25; *see also id.* at 806) For the majority of her four-hour work days, Saragino sat at her

desk. (*Id.* at 806) She used a cane or crutches when she had to walk to and from the restroom

and her car. (*Id.* at 807, 825) When using the copier, Saragino lifted up to 10 pounds. (*Id.* at

807) By September 2005, Saragino was unable to work due to severe pain in her wrists and

fingers because of her arthritis and carpal tunnel. (*Id.* at 808) Saragino did not plan to return to

work in the future. (*Id.* at 809)

Saragino identified her most significant health problem as her arthritis, which causes

daily pain, swelling, and stiffness in her joints, and instability in her knees. (*Id.* at 809, 811) She

explained that her psoriatic arthritis was diagnosed in 2001, while her rheumatoid arthritis was

recently diagnosed. (*Id.* at 809-10) She described her pain medications as "barely controlling"

her pain, leaving her with a daily pain level of 7.5 to 8 out of 10 and doing nothing for her

swelling. (*Id.* at 811-12)

The ALJ next questioned Saragino about her additional medical issues. As for her right

knee, Saragino testified that while her 2008 arthroscopic surgery repaired a torn meniscus caused

by one of her falls, there are no cures for the arthritis and RSD. (*Id.* at 813) As for Saragino's

left knee, at the time of the hearing it remained "severely swollen." (*Id.*) Her physicians

indicated to Saragino that surgery might succeed in removing some fluid in that knee. (*Id.*) With

respect to her right hand, Saragino testified that her carpal tunnel has not flared up since 2005

since she no longer types. (*Id.*) Saragino testified that she experienced problems with her neck,

including limited range of motion, due to two herniated discs and nerve damage suffered as a

result of the July 2007 car accident. (*Id.* at 813-14) Saragino stated that while she had not had

any mental health treatment since 2007, Dr. Yezdani continued to prescribe her Paxil and

Cymbalta for depression and Xanax for anxiety, which generally controlled her symptoms. (*Id.*

at 814-15) Even so, she noted that it "get[s] depressing when [she] cannot participate in [her]

children's activities" because she has had difficulty leaving her home since the car accident. (*Id.*

at 815) Saragino testified that she has dealt with migraines since she was a teen, but had been

experiencing daily headaches since the car accident—headaches that she said her doctors had

attributed to her herniated discs. (*Id.*) Medication relieved them to a degree, but not completely.

(*Id.* at 815-16) Lastly, Saragino described other health-related issues that she faced. (*Id.* at 816-

20)

With regard to her mobility, Saragino testified that before her July 2007 car accident, she was using a cane or crutches. (*Id.* at 824) When she had to use crutches, she mostly used one, unless she was having a flare-up of swelling in her knees, in which case she would have to use two. (*Id.*) After the car accident, Saragino began to use a wheelchair. (*Id.* at 812) She testified that Dr. Yezdani prescribed it for her because she has RSD in her legs, and following the accident her legs became very weak and would give out, causing several falls. (*Id.*) On the average day, Saragino stated that she walked "[l]ess than 10 feet," instead using her wheelchair to get around the house. (*Id.* at 817) She testified that she could not stand for longer than five minutes, could not lift more than five pounds, and was unable to bend, kneel, or stoop. (*Id.* at 817-18)

As for activities of daily living, Saragino required her husband's assistance in caring for her hygiene. (*Id.* at 820) He helped her bathe and get dressed. (*Id.* at 818, 820) She indicated that while she could hold things like utensils, pens, toothbrushes and combs with her right hand, it was "very hard to hold things with her left hand." (*Id.* at 818) She added that it was difficult to do things when she needed her cane because she was right-handed, and yet she needed to use her right hand to steady her cane. (*Id.*) When her pain was severe, Saragino testified that it was really hard to concentrate. (*Id.* at 818-19)

Since Saragino's 2007 motor vehicle accident, she testified that she could no longer do household chores, attend her children's school events, or go out to eat. (*Id.* at 821-22) Saragino's washer and dryer are located in the basement, and since she had fallen down the basement stairs at least four times, her husband took over the laundry. (*Id.* at 821) He also did

26

the grocery shopping, while both he and Saragino paid bills. (*Id.*) Saragino enjoyed reading

when she was able to concentrate, using a Kindle to avoid having to hold a book with both hands.

(*Id.* at 822) With respect to her daily routine, Saragino testified once her children left for school,

she took her morning medications, which make her tired, and went back to bed until noon. (*Id.* at

822-23) Thereafter, she would recline her leg in the living room and watch television or read if

she could concentrate. (*Id.*)[10]

Regarding her need for leg elevation, Saragino testified that she elevates her left foot

every day, for the entire day, except for bathroom breaks. (*Id.* at 826) If she is unable to elevate

her foot, her knee swelling and stiffness increases and the pain becomes unbearable. (*Id.*)

### b.     The Vocational Expert's Testimony

VE Leviton next testified. (Tr. at 827-31) She described Saragino's prior work as a

credit analyst as semi-skilled and sedentary in exertion, which would be a Skilled Vocational

Preparation ("SVP") Level 4. (*Id.* at 827) She stated that Saragino's work as a pharmacy

technician was semi-skilled and medium in exertion (as the job was described by Saragino), with

an SVP of 3. (*Id.*) Leviton testified that Saragino would have "data entry kind of skills" that

---

[10]     Saragino had previously described her abilities in other documents that are a part
of the record. In an April 2007 Function Report (completed prior to the July 2007 car accident),
Saragino had reported that the only household chore she was able to do was fold clothes from her
recliner, which she did once per week for a maximum of 15 minutes. (Tr. at 116) She also
explained that she used to enjoy painting, drawing, and dancing, but that she was no longer able
to participate in these hobbies due to her arthritis. (*Id.* at 118, 132) While she indicated that she
did not go out often because of her pain and legs giving out, she explained that she could go out
alone as long as she used her cane. (*Id.* at 117, 119) She stated that she could walk 20 feet or
less before needing to rest. (*Id.* at 119, 132) By the time of a February 2009 report, Saragino
stated that she needed company when going out alone (due to falling issues), could not do any
household chores, and could only walk for 10 feet before needing to stop and rest. (*Id.* at 147-48,
150)

would transfer to sedentary positions. (*Id.* at 828)

The ALJ asked Leviton the following hypothetical question:

> [I]f we have a hypothetical individual who is the claimant's stated
> age at onset, approximately 31 years [old]; this individual has a
> high school education, is able to read, write, and do at least simple
> math; has the work history that you have just talked about. There
> are certain underlying impairments that place limitations on the
> ability to do work-related activities. We'll be talking about a
> sedentary level of exertion. Pushing and pulling is limited with the
> upper and lower extremities; posturals are all occasional, but no
> climbing of any ladders, ropes, or scaffolds. This individual
> should avoid working overhead, and handling/fingering with the
> dominant right hand is frequent, as opposed to constant.
> Environmentally, should avoid concentrated exposure to
> temperature extremes, wetness, humidity, fumes, odors, dusts,
> gases, poor ventilation, vibration, and [] hazards being defined as
> heights and moving machinery. Finally, this individual would be
> limited to simple, unskilled work, work done at a production pace,
> meaning paid by piece or working at an assembly line; and low-
> stress work, defined as only occasional need to make decisions or
> to use judgment. In your opinion, with these limitations, could
> such a person do either of the claimant's past relevant jobs?

(*Id.* at 828-29) Leviton answered no. (*Id.* at 829) But Leviton stated that there was simple,

unskilled work in the regional and national economy that the hypothetical person could perform.

(*Id.*) At the sedentary, unskilled level, Leviton gave examples of an addressor, order clerk for

food and beverage, and charge account clerk. (*Id.*) The ALJ then asked whether the use of a

wheelchair would preclude all work, to which Leviton responded that "[b]eing in a wheelchair

does not preclude all work, especially at the sedentary level." (*Id.*) Leviton further testified that

the use of a wheelchair would have "[m]inimal impact" on the three jobs previously referenced.

(*Id.*)

When questioned by Saragino's attorney, Leviton testified that if an individual was

required to keep their legs elevated on a regular basis to their heart level, then "they would not be able to do the sedentary jobs." (*Id.* at 830) Were an individual required to elevate their legs at hip level, Leviton indicated that it "would be difficult . . . for a desk job" and then said that such a person could not do sedentary work. (*Id.*) Saragino's attorney next asked if an individual in a wheelchair that had limited use of their hands and poor bilateral dexterity would be able to maintain those jobs, to which Leviton responded that "[i]f the limited use of hands results in a loss of productivity greater than 15 to 20 percent, then, yes, at that point, there would be no work." (*Id.*) Leviton also agreed that at some point, severe pain "would likely interfere" with an individual's ability to maintain gainful employment, to the point where the person could not be employed. (*Id.* at 830-31) She further indicated that if an individual needed to rest for four hours during the work day due to medications, he or she would not be able to maintain the above-referenced positions. (*Id.* at 831)

### 3. The ALJ's Findings

On April 26, 2010, the ALJ issued the following ten findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2011.

2. The claimant has not engaged in substantial gainful activity since September 5, 2005, the alleged onset date (20 C.F.R. 404.1571 *et seq.*).

3. The claimant has the following severe impairments: psoriatic arthritis, cervical and lumbar degenerative disc/joint disease, reflex sympathetic dystrophy (RSD) of the left knee, depression/anxiety, and obesity (20 C.F.R. 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the

29

listed impairments in 20 C.F.R. Part 404, Subpart P,
Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and
404.1526).

5.    After careful consideration of the entire record, the [ALJ
      found] that the claimant has the residual functional capacity
      to perform a significant range of sedentary work as defined
      in 20 C.F.R. 404.1567(a).

6.    The claimant is unable to perform any past relevant work
      (20 C.F.R. 404.1565).

7.    The claimant was born on May 27, 1974 and was 31 years
      old, which is defined as a younger individual age 18-44, on
      the alleged disability onset date (20 C.F.R. 404.1563).

8.    The claimant has at least a high school education and is
      able to communicate in English (20 C.F.R. 404.1564).

9.    Transferability of job skills is not material to the
      determination of disability because using the Medical-
      Vocational Rules as a framework supports a finding that the
      claimant is "not disabled," whether or not the claimant has
      transferable job skills (See SSR 82-41 and 20 C.F.R. Part
      404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work
      experience, and residual functional capacity, there are jobs
      that exist in significant numbers in the national economy
      that the claimant can perform (20 C.F.R. 404.1569 and
      404.1569(a)).

(Tr. at 19-35)

## II.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil

Procedure 56. (D.I. 11; D.I. 13) In determining the appropriateness of summary judgment, the

Court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the

non-moving party' but not weighing the evidence or making credibility determinations." *Hill v. City of Scranton*, 411 F.3d 118, 124-25 (3d Cir. 2005) (alterations in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## B.    Review of the ALJ's Findings

The Court must uphold the Commissioner's factual findings if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (citation omitted). In analyzing whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986). Even if the reviewing court would have decided the factual inquiry differently, it must defer to the ALJ and affirm the Commissioner's decision, so long as the decision is supported by substantial evidence. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Monsour*, 806 F.2d at 1190–91.

In addition to conducting an inquiry into whether substantial evidence supports the ALJ's determination, the Court must also review the ALJ's decision for the purpose of determining whether the correct legal standards were applied. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). The Court's review of legal issues is plenary. *Id.*; *Hipkins v. Barnhart*, 305 F. Supp. 2d

394, 398 (D. Del. 2004).

## III.    DISCUSSION

### A.    Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1), "provides for the payment of

insurance benefits to persons who have contributed to the program and who suffer from a

physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). In order to qualify

for DIB, the claimant must establish that she was disabled prior to the date she was last insured.

20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is

defined as the "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42

U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A); *Barnhart v.*

*Thomas*, 540 U.S. 20, 21-22 (2003).

To determine whether a person is disabled, the Commissioner is required to perform a

five-step sequential analysis. 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422,

428 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the

sequential process, then the Commissioner will not review the claim further. *See* 20 C.F.R. §

404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in

substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i) (mandating a finding of nondisability

when claimant is engaged in substantial gainful activity). If the claimant is not engaged in

substantial gainful activity, step two requires the Commissioner to determine whether the

claimant is suffering from a severe impairment or a combination of impairments that is severe.

20 C.F.R. § 404.1520(a)(4)(ii) (mandating a finding of non-disability when claimant's

impairments are not severe). If the claimant's impairments are severe, then the Commissioner

proceeds to step three, and must compare the claimant's impairments to a list of impairments (the

"listings") that are presumed severe enough to preclude any gainful work. 20 C.F.R. §

404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment meets or equals

an impairment in the listings, the claimant is presumed disabled. *See* 20 C.F.R. §

404.1520(a)(4)(iii). If a claimant's impairment fails to meet or medically equal any listing, the

Commissioner should proceed to steps four and five. 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual

functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv) (stating

that a claimant is not disabled if she is able to return to past relevant work); *Plummer*, 186 F.3d

at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations

caused by his or her impairment(s)." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 201 (3d Cir.

2008) (citation omitted). "The claimant bears the burden of demonstrating an inability to return

to her past relevant work." *Plummer*, 186 F.3d at 428 (citation omitted).

If the claimant is unable to return to her past relevant work, step five requires the

Commissioner to determine whether the claimant's impairments preclude her from adjusting to

any other available work. 20 C.F.R. § 404.1520(g) (mandating a finding of non-disability when

33

the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden of

production is on the Commissioner to show that the claimant is capable of performing other

available work before denying disability benefits. *Plummer*, 186 F.3d at 428. In other words,

the ALJ must show that "there are other jobs existing in significant numbers in the national

economy which the claimant can perform, consistent with her medical impairments, age,

education, past work experience, and residual functional capacity." *Id.* When making this

determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments.

*Id.* At this step, the ALJ often seeks the assistance of a vocational expert. *Id.* (citation omitted).

## B. Saragino's Arguments on Appeal

On appeal, Saragino presents several arguments: (1) the ALJ erred in finding that

Saragino's medical impairments did not meet the severity of Listing 1.02A; (2) the ALJ erred in

finding that Saragino's headaches did not amount to a severe impairment; (3) the ALJ failed to

properly weigh the opinions of Saragino's treating physicians; (4) the ALJ failed to properly

assess Saragino's credibility; and (5) the ALJ failed to properly assess Saragino's RFC. (D.I. 12

at 1-2) Saragino requests that the Court vacate the ALJ's decision and enter an award of benefits

rather than remand for further proceedings, or, in the alternative, remand for consideration of

additional evidence pursuant to sentence four or sentence six of 42 U.S.C. § 405(g). (*Id.* at 20)

The Court addresses these arguments in turn.

### 1. The ALJ's Step Three Analysis of Saragino's Impairments

Saragino first argues that the ALJ erred at step three of the evaluation process, by

concluding that Saragino's lower back, left arm and knee impairments (at least as of the time of

her July 2007 car accident) did not meet the criteria for Listing 1.02A. (D.I. 12 at 1, 9-13; D.I. 16

at 2-6) At step three, the claimant bears the burden of submitting medical findings that show her impairment matches a listing or is equal in severity to a listed impairment. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 n.2 (3d Cir. 2000) (citing *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992)). In order to meet the requirements of a listing, the claimant's alleged impairment must satisfy or equal "*all* of the specified medical criteria." *Garrett v. Comm'r of Soc. Sec.*, 274 F. App'x 159, 162 (3d Cir. 2008) (emphasis in original) (quoting *Jones v. Barnhart*, 364 F.3d 501, 504 (3d Cir. 2004)); *see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Listing 1.02A governs the major dysfunction of a joint due to any cause, and, for our purposes here, requires three findings: (1) a gross anatomical deformity and chronic joint pain and stiffness, with signs of limitation of motion or other abnormal motion of the affected joint; (2) "findings on appropriate medically acceptable imaging [showing] joint space narrowing, bony destruction, or ankylosis of the affected joint(s)"; with (3) a finding of the involvement of a major peripheral weight-bearing joint, resulting in the inability to ambulate effectively, as defined in Section 1.00B2b. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02.

The ALJ concluded that Saragino did not have an impairment or combination of impairments that met or medically equaled Listing 1.02 for two reasons: (1) the record did not contain the required medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis; and (2) assuming *arguendo* that Saragino's use of a wheelchair was medically necessary, such use did not limit the functioning of her upper extremities and therefore did not render her unable to ambulate effectively. (Tr. at 24-26) Saragino focuses almost exclusively on the latter conclusion in arguing that the ALJ's step three finding is erroneous. (D.I. 12 at 9-13; D.I. 16 at 2-6) The Court need not go further than the first of these reasons, however, in

determining that the ALJ's decision is supported by substantial evidence.

In support of her conclusion that "no findings of joint space narrowing, bony destruction, [or] ankylosis" are contained in the record, the ALJ pointed to the following "imaging findings" that are in the record:

1. A November 19, 2005 MRI of the lumbar spine showing minimal to mild disc bulges at the L4-S1 levels, with mild facet arthropathy but without disc herniation or stenosis, (Tr. at 464);

2. A June 12, 2006 x-ray of the [left] wrist which was normal, (*id.* at 267);

3. June 12, 2006 x-rays of bilateral knees which were normal and without evidence of degenerative change, (*id.* at 266);

4. A November 16, 2006 MRI of the left knee showing a multilobulated cyst with evidence of recent partial rupture; subcutaneous edema (likely due to cellulitis); no evidence of internal derangement; and nodular soft tissues, likely synovial chondromatosis, (*id.* at 212-13);

5. A July 10, 2007 x-ray of the left ankle, which was unremarkable; x-ray of the chest, which was normal; x-ray of the cervical spine, which was normal; and x-ray of the left knee which showed mild suprapatellar joint effusion, no bony or other soft tissue abnormality, (*id.* at 402-06);

6. A July 23, 2007 CT scan of the cervical spine showing tiny C2-C5 disc protrusion, C5-C7 central and left paracentral disc protrusions, C3-C7 facet arthropathy, generalized disc space narrowing, and loss of cervical lordosis, all without stenosis, (*id.* at 651);

7. An April 17, 2008 bone scan of the lower right extremity that was normal, (*id.* at 178-80); and

8. A June 26, 2008 MRI study of bilateral knees showing large effusions, prominent popliteal cysts, with extensive proteinaceous debris and evidence of meniscal tear on the

left knee, (*id.* at 460-61).

(*Id.* at 25-26; *see also* D.I. 15 at 13) In response, Saragino argues the ALJ erred in finding no "joint space narrowing, bony destruction, or ankylosis"[11] because "there is ample evidence" that Saragino had "significant deterioration of both knees[,]" pointing to: (1) a "January 2007 MRI" of her knees; and (2) an April 2009 DEXA scan. (D.I. 16 at 3 (citing Tr. at 664, 739))[12]

With respect to the first piece of evidence, there is no January 2007 MRI in the record. Instead, in support of the existence of a "January 2007 MRI show[ing] cartilage disruption of [Saragino's] knees," Saragino cites to a January 17, 2007 progress note from Dr. Falco. (D.I. 12 at 12 (citing Tr. at 664); D.I. 16 at 3 (citing Tr. at 664)) In that report, Dr. Falco writes: "Dr. Kupcha saw no tear on the MRI but did reveal cartilage disruption[.]" (Tr. at 664)[13]

Dr. Falco's ambiguous reference to an MRI that is not itself in the record does not satisfy the criteria for a "finding[] on appropriate medically acceptable imaging" regarding one of the

---

[11]     Saragino also asserts that the ALJ erred in finding "no . . . nerve root compression, arachnoiditis or spinal stenosis . . . in the record." (D.I. 16 at 2) At the administrative hearing, Saragino argued that she met Listing 1.02 and/or Listing 1.04. (Tr. at 24) While the three conditions listed above are required findings with respect to Listing 1.04, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04, they are not required for Listing 1.02. Saragino has not challenged the ALJ's conclusion with respect to Listing 1.04 on appeal, and accordingly the Court focuses herein on findings of joint space narrowing, bony destruction or ankylosis.

[12]     Saragino additionally points to medical records from September 2010 and November 2010 as supplying the requisite evidence here. (D.I. 12 at 12; D.I. 16 at 3) Saragino submitted these records to the Appeals Council following the ALJ's April 2010 decision, and they are the subject of her request for remand pursuant to sentence six of 42 U.S.C. § 405(g), which is further discussed *infra*. However, evidence submitted after an ALJ's decision cannot be used to argue that the ALJ's decision is not supported by substantial evidence, *see Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001), and so the Court will not consider it in reviewing the ALJ's step three conclusion.

[13]     Similarly, in his December 20, 2006 report, Dr. Falco noted, "Dr. Kupcha saw no tear on the MRI." (Tr. at 666)

conditions-at-issue referenced in Listing 1.02A. For one thing, there is no medical record here from Dr. Kupcha interpreting an MRI to reveal cartilage disruption (indeed, there are no notes from Dr. Kupcha at all in the transcript). Perhaps more importantly, Saragino makes no argument to the Court explaining how a finding of "cartilage disruption" in her knee would satisfy one of the requirements in the relevant part of Listing 1.02A. (D.I. 12 at 12; D.I. 16 at 3) Accordingly, the Court finds no error in the ALJ's failure to consider this "January 2007 MRI" in reaching her step three conclusion as to Listing 1.02A.

As for the April 2009 DEXA scan showing "areas of osteopenia" (a condition in which bone mineral density is lower than normal) in Saragino's knees, (D.I. 16 at 3 (citing Tr. at 739)), the bone scan report itself is not in the record. The only reference to that scan comes in two sentences of Dr. Falco's June 8, 2009 progress report, in which he notes that Saragino's "DEXA scan indicated areas of osteopenia." (Tr. at 739) The Court is not persuaded that this notation demonstrates the requisite finding of joint space narrowing, bony destruction or ankylosis. Nor does Saragino provide any explanation or authority that would explain how it possibly could. (D.I. 16 at 3)

In sum, while it is certainly clear from the record that Saragino suffered from chronic pain, RSD and arthritis in her knees, for Saragino to show that her impairment matches Listing 1.02A, she must meet *all* of that listing's criteria. The ALJ's conclusion that the record did not contain the requisite imaging studies demonstrating joint space narrowing, bony destruction or ankylosis is supported by substantial evidence. (D.I. 15 at 13-14) Therefore, the ALJ's

conclusion that Saragino's medical condition did not meet or equal Listing 1.02A is not flawed.[14]

## 2. The ALJ's Failure to Find Plaintiff's Headaches to be Severe Impairments

Saragino next argues the ALJ erred at step two, when she found that Saragino's headaches were not severe impairments. (D.I. 12 at 13; D.I. 16 at 6-7; *see also* Tr. at 19) Saragino submits "[t]he ALJ incorrectly assumed [she] suffered only from migraine headaches, and failed to consider the daily [general] headaches she experienced as a result of her other impairments, particularly the damage caused to her cervical spine" due to the July 2007 auto accident. (D.I. 12 at 13; D.I. 16 at 6)

The United States Court of Appeals for the Third Circuit has explained that the step two inquiry into severity "is a *de minimis* screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003); *see also Rosa v. Comm'r of Soc. Sec.*, Civil Action No. 12-5176 (JLL), 2013 WL 5322711, at *6 (D.N.J. Sept. 20, 2013). According to 20 C.F.R. § 404.1521(a), an impairment is not severe if it does not significantly limit a claimant's physical or mental ability to perform basic work activities. The regulations define

---

[14]   *Cf. Sturick v. Astrue*, No. 5:11-cv-662 (GLS), 2012 WL 4866457, at *2 (N.D.N.Y. Oct. 12, 2012) (upholding an ALJ's finding that the plaintiff did not meet Listing 1.02A because the plaintiff only cited to evidence documenting, *inter alia*, tearing, mild osteoarthritis, and small joint effusion, but not the required finding on medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the plaintiff's knee); *Forest v. Astrue*, Civil Action No. 11-2017, 2012 WL 3137844, at *12 (E.D. La. Aug.1, 2012) ("The medical records contain evidence of decreased range of motion in plaintiff's right knee, but no medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of that knee. Therefore, he does not meet the [ ] requirement of Listing 1.02 in his right knee."), *report and recommendation adopted*, 2012 WL 3437514 (E.D. La. Aug.15, 2012); *Stine v. Astrue*, No. 4:10-cv-102-RLY-DML, 2011 WL 4538417, at *3 (S.D. Ind. Sept. 29, 2011) (affirming the ALJ's decision to reject the plaintiff's Listing 1.02A claim because, *inter alia*, the record did not contain the requisite medically acceptable imaging studies).

39

basic work activities as the abilities and aptitudes necessary to do most jobs, including mental activities such as understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. *See* 20 C.F.R. § 404.1521(b). Thus, an impairment is not "severe" if the evidence presented by a claimant demonstrates only a "slight abnormality" that has "no more than a minimal effect" on the claimant's ability to work. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) (citations omitted); *see also Newell*, 347 F.3d at 546. The burden of showing that an impairment is severe rests with the claimant. *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 (3d Cir. 2007). Any doubt as to whether this showing has been made is to be resolved in favor of the claimant. *McCrea*, 370 F.3d at 360; *Newell*, 370 F.3d at 547.[15]

Saragino is correct that in the ALJ's analysis of whether her headaches amounted to a severe impairment, the ALJ was focused on Saragino's migraine condition, and did not appear to consider any additional, separate "general headache" condition. (Tr. at 22) The Court does not find error here, however.

As an initial matter, the record supports the ALJ's conclusion that the primary headache-related issue that plagued Saragino were her migraine headaches, and that Saragino suffered from such migraines both before and after the July 2007 auto accident. For example, one record the

---

[15]     While the Third Circuit has indicated that an ALJ's determination to deny an applicant's request for benefits at step two (that is, a finding that the applicant suffers from no severe impairments) should be reviewed with close scrutiny, it has also made clear a reviewing court is not to apply a more stringent standard of review with respect to this step. *McCrea*, 370 F.3d at 360. Rather, "[t]he Commissioner's denial at step two, like one made at any other step in the sequential analysis, is to be upheld if supported by substantial evidence on the record as a whole." *Id.* at 360-61.

ALJ cited in concluding that Saragino's headaches were not severe is the December 2007 report by Dr. Lifrak, a state agency physician. (Tr. at 22) During this examination, Saragino reported "headaches" as one of Saragino's chief complaints. (*Id.* at 417) However, even though this examination took place five months after the July 2007 auto accident, Saragino did not link this condition (or a worsening thereof) directly to the accident. (*Id.* at 417-18) Instead, when she referenced her "headaches" to Dr. Lifrak, Saragino appears to have been referring to the migraine headaches that had occasionally plagued her for years. She reported that she "first began to experience [these headaches] in 1997[,]" that they occurred on an "intermittent basis," and that when they occur they were global and severe in intensity. (*Id.* at 418) Additionally, as the Commissioner points out, (D.I. 15 at 17), Saragino's treating physician, Dr. Yezdani, also appears to describe Saragino's post-accident headaches as "migra[i]nes[,]" (Tr. at 513, 743). And in an April 21, 2008 Disability Report—completed nine months *after* the accident—Saragino indicated that she had experienced "[n]o" new conditions since the time of her previously-filed 2007 Disability Report (a report in which she had made reference to her migraine headaches). (*Id.* at 100, 138; *see also id.* at 45 (Saragino listing "migraines" (but no other headache condition) as one of her conditions in a March 27, 2008 request for reconsideration form))[16]

In concluding that Saragino's headaches were not severe, the ALJ noted that "[t]he medical evidence of record illustrates no worsening in the claimant's headache[] complaints since 2007[.]" (*Id.* at 22) This statement is not entirely accurate. On January 16, 2008, during a

---

[16]     The Court notes that Saragino did complain of a headache "different from her usual migraine type headache" at her September 12, 2007 visit with Dr. Falco. (Tr. at 639)

41

visit at Mid-Atlantic Spine, Saragino "complain[ed] of severe headaches which have been worsened since her auto accident." (*Id.* at 613) By December 22, 2008, she told Dr. Falco that "[s]he continues to have daily headaches[.]" (*Id.* at 562) And at a January 18, 2010 visit with Dr. Falco, Saragino reported "increased . . . headaches." (*Id.* at 719; *see also id.* at 815)

Even so, as the ALJ explained, none of Saragino's treating physicians described any particular limitations arising from this impairment. (*Id.* at 22 (citing *id.* at 502-05, 743)) Saragino argues that her headaches "prevented her from performing the physical demands of even sedentary work on a regular basis, 40 hours a week, and further prevented her from performing even unskilled mental functions on a regular and consistent basis necessary to remain employed at even unskilled work." (D.I. 12 at 13; *see also* D.I. 16 at 7) Tellingly, she cites to nothing in support. (*Id.*) Dr. Falco, the physician that Saragino treated with most frequently, did not even include mention of migraines or headaches as one of Saragino's diagnoses or symptoms in his November 24, 2008 RFC questionnaire. (Tr. at 502-05) Nor did he make mention of migraines or headaches in a March 8, 2010 note in which he listed several diagnoses and described Saragino's resulting limitations. (*Id.* at 744) While many progress notes from Dr. Falco noted "headaches yes" in the "review of symptoms" section, these notes also reported that Saragino's concentration and remote memory were normal, that she concentrates well, that she was not easily distracted, and that her speech was smooth and clear. (*See, e.g., id.* at 549, 550, 559, 561, 562, 564, 565, 567-69, 576, 579, 582, 584, 589, 591, 592, 594, 596, 597, 599, 600, 603, 604, 606, 607, 614, 617, 623, 628, 631, 633, 638, 640, 642, 644, 648-49, 653, 659, 661, 663, 667, 720, 723, 726, 728-30) For his part, Dr. Yezdani did make note of Saragino's migraines in his February 5, 2010 letter, but none of the limitations that he thereafter described

appear to be related to Saragino's headache condition. (*Id.* at 743)

In sum, the ALJ's conclusion that Saragino's headaches are a non-severe impairment is supported by substantial evidence. *See DeCarlo v. Barnhart*, 116 F. App'x 387, 390 (3d Cir. 2004) (affirming the district court's finding of no error in the ALJ's determination that the plaintiff's headaches were not a severe impairment, where "neither her treating nor examining physicians placed any restrictions on her as a result of her headaches"); *Tenley v. Astrue*, Civil Action No. 11-282, 2013 WL 141608, at *6-7 (W.D. Pa. Jan. 11, 2013) (concluding that the ALJ's finding that the plaintiff's headaches were not severe was supported by substantial evidence where, *inter alia*, "there is no evidence that any physician found that plaintiff had any impairments or work limitations resulting from headaches"); *Fisher v. Astrue*, No. 2:07cv1355, 2009 WL 904696, at *6 (W.D. Pa. Mar. 31, 2009) (rejecting the plaintiff's argument that the ALJ erred in finding that the plaintiff's headaches were not severe where, *inter alia*, "nothing in the record suggests that the headaches bore any impact on [the p]laintiff's ability to perform basic work functions").[17]

### 3.     Treating Physician Doctrine

Saragino next argues that the ALJ did not give the medical opinions of Saragino's treating physicians Dr. Falco and Dr. Yezdani appropriate weight, and that the ALJ erred by placing more weight on the opinion of Dr. Borek, the non-examining state agency physician.

---

[17]     The Court also notes that, as the Commissioner points out, (D.I. 15 at 18-19), although the ALJ found Saragino's headaches to be non-severe, the ALJ appeared to consider all of Saragino's limitations in her later RFC determination. (*See* Tr. at 28 (in a discussion of the RFC determination, the ALJ stating that she "considered *all* of the claimant's reported symptoms" and considered "the entire record") (emphasis added)); *see Salles*, 229 F. App'x at 145 n.2.

(D.I. 12 at 13-15; D.I. 16 at 8) Here, the Court agrees.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord

treating physicians' reports great weight, especially 'when their opinions reflect expert judgment

based on a continuing observation of the patient's condition over a prolonged period of time.'"

*Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer*, 186 F.3d at 429); *see also*

*Dougherty v. Astrue*, 715 F. Supp. 2d 572, 580 (D. Del. 2010). The applicable Social Security

regulations instruct that:

> Generally, we give more weight to opinions from your treating
> sources, since these sources are likely to be the medical
> professionals most able to provide a detailed, longitudinal picture
> of [a claimant's] medical impairment(s) and may bring a unique
> perspective to the medical evidence that cannot be obtained from
> the objective medical findings alone or from reports of individual
> examinations, such as consultative examinations or brief
> hospitalizations.

20 C.F.R. § 404.1527(c)(2); *see also Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).

These regulations instruct that if a treating source's opinion as to the nature and severity

of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

record," it will be given "controlling weight." 20 C.F.R. § 404.1527(c)(2); *see also* SSR 96-2P,

1996 WL 374188, at *2 (July 2, 1996). After undertaking this analysis, if an ALJ determines that

a treating physician's opinion is not entitled to controlling weight, he or she must then determine

what weight to give the opinion by considering several factors: (1) the length of the treatment

relationship and the frequency of examination, (2) the nature and extent of the treatment

relationship, (3) the degree to which the physician presents relevant medical evidence in support

of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the degree to

which the opinion relates to an area in which the physician specializes, and, (6) any other factors

which support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6).

Where a treating physician's opinion conflicts with that of a non-treating, non-examining

physician, an ALJ may choose whom to credit but "cannot reject evidence for no reason or for

the wrong reason." *Plummer*, 186 F.3d at 429 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066

(3d Cir. 1993)). An ALJ may reject a treating physician's opinion as long as the rejection is due

to contradictory medical evidence, rather than the ALJ's "own credibility judgments, speculation,

or lay opinion." *Morales*, 225 F.3d at 317.

Here, as noted above, Saragino challenges the weight the ALJ accorded to three medical

sources: (1) Dr. Falco, Saragino's pain management physician; (2) Dr. Yezdani, Saragino's

primary care physician; and (3) Dr. Borek, a non-examining State agency medical consultant.

The Court will address each in turn.

### a.    Dr. Falco

Following years of regular visits with Saragino, Dr. Falco completed November 2008 and

March 2010 assessments in which he placed numerous restrictions on Saragino's abilities to sit,

stand, walk, and engage in various activities, and found Saragino to be in constant, severe pain.

(Tr. at 502-05, 744) The VE testified that an individual with certain of these restrictions (that is,

an individual who needs to keep her legs elevated to waist level, or who has very limited use of

both hands) or who is in severe pain would not be able to perform sedentary work. (*Id.* at 830-

31) Therefore, the manner in which the ALJ reviewed and considered Dr. Falco's opinion is

important, because if after analyzing his opinion in the manner required by law, the ALJ were to

have assigned it controlling weight, then a finding of disability would almost certainly have followed. Even if not assigned controlling weight, were the ALJ to have accorded Dr. Falco's opinion a significant amount of weight, that might well have altered the ALJ's ultimate disability determination.

The ALJ concluded, however, that Dr. Falco's medical opinion should only be afforded "little weight." (*Id.* at 32) The Court finds that the ALJ's treatment of Dr. Falco's opinion amounted to legal error in the following numerous respects.

First, the ALJ did not accurately describe certain information that bolstered Dr. Falco's opinion. The ALJ asserted that in Dr. Falco's "voluminous treatment records," he had consistently noted Saragino's complaints of increasing and chronic pain, but had consistently recorded "minimal" clinical findings. (*Id.* at 31) Indeed, the only specific "clinical findings" that the ALJ points to in this section are benign findings: Dr. Falco's frequent notations of normal "5/5" strength in both Saragino's upper and lower extremities and normal muscle tone in both her upper and lower extremities without spasticity, atrophy, cogwheeling or abnormal movements. (*Id.*)

As an initial matter, the Court notes that not every progress note is a model of clarity with respect to muscle strength. The "physical examination" portion of many of Dr. Falco's progress notes actually states: "Muscle strength normal (5 out of 5) in both upper and lower extremities *decreased in upper and lower extremities*." (*Id.* at 633, 640, 644, 653, 656, 659, 661, 663, 665, 667 (emphasis added))[18] That statement could very well be interpreted as a finding that

_____

[18]     In contrast, many other notes indicate "[m]uscle strength normal (5 out of 5) in both upper and lower extremities yes." (Tr. at 550, 561, 564, 567, 570, 580, 584, 591, 594, 597, 600, 607, 614, 623, 631, 638, 642, 649, 720, 723, 726, 728, 729)

Saragino's muscle strength was in fact decreased in both her upper and lower extremities.[19] Even

more importantly, the ALJ simply omits mention here of other clinical findings cited by Dr.

Falco. These include his notations of swelling in Saragino's knees, (*see, e.g., id.* at 607, 614,

623, 723), or his frequent findings of a limited range of motion in Saragino's knees, (*see, e.g.,*

*id.* at 560, 563, 566, 569, 579, 584, 723). *Cf. Gonzales v. Astrue*, 537 F. Supp. 2d 644, 662 (D.

Del. 2008) (references in the record to reduced range of motion are properly considered as

objective medical evidence). These more serious clinical findings are consistent with the

findings of multiple other treating physicians on multiple occasions throughout the relevant time

period.[20]

---

[19]     The Court notes that state agency physician Dr. Lifrak conducted a physical examination of Saragino on December 31, 2007. His findings were that while Saragino's grip strength in the upper extremities was 5/5 on the right, she was not able to perform any gripping maneuvers with her left hand; he also noted "[m]uscle tone in the lower extremities was 3/5 on right, 4/5 on the left." (Tr. at 420)

[20]     (*See, e.g.,* Tr. at 341 (February 2, 2006 observations by Dr. Javed that "[t]here is synovitis in the left knee with periarticular tenderness and swelling" and Saragino "has a Baker's cyst behind the right knee which is very tense" and a "swollen" foot); *id.* at 183 (September 24, 2006 observations by Dr. Johnson that Saragino's knee demonstrated "approximately ninety degrees of flexion, zero degrees of extension . . . . [and] [h]er patella femoral joint is mildly crepitant with lateral tracking noticed. Quadriceps weakness is noted with attempts on strength testing"); *id.* at 338 (November 28, 2006 observations by Dr. Javed that "[t]he patient has periarticular swelling around the left knee, especially the quad tendons"); *id.* at 474 (February 13, 2007 observations by Dr. Johnson that Saragino "has a moderate effusion about the knee" and "ROM from 90 [degrees] of flexion, 0 [degrees] of extension"); *id.* at 336 (February 28, 2007 observation of Dr. Javed that Saragino's "left knee shows signs of suprapatellar bursitis as well as some effusion in the knee"); *id.* at 701 (September 24, 2008 observations of Dr. Javed with respect to Saragino's knees "normal alignment and ROM, bony changes, effusion, tenderness"); *id.* at 708-09 (April 21, 2009 observations of Dr. Rocca that Saragino had "[i]mpaired knee flexion, knee effusions, cervical spine limited lateral flexion, lumbar spine limited flexion" and stating that Saragino, a "most unfortunate woman. . . . clearly has evidence of an inflammatory arthritis"); *id.* at 776 (February 8, 2010 observations of Dr. Cowdery that Saragino had "peripatellar fullness, synovial thickening, crepitus, and pain with ROM" in her knees, left greater than right); *id.* at 750, 756 (February 23 and March 12, 2010 observations of Dr. Cowdery

Second, the ALJ characterizes Dr. Falco's treatment notes and assessment as merely recording Saragino's complaints, "without attributing [her] limitations to any clinical, radiographic, imag[ing], or other objective findings." (Tr. at 31-32) This is not accurate. Dr. Falco's records reference numerous pieces of objective medical evidence that relate to Saragino's expressed limitations. Saragino's November 2005 MRI, which showed minimal to mild disc bulges at the L4-S1 levels with mild facet arthropathy, was documented in the Mid-Atlantic Spine treatment records. (*See, e.g., id.* at 319) Dr. Falco himself conducted an EMG in May 2006 which was abnormal, showing right L5 motor radiculopathy and suggestive of left L5-S1 motor radiculopathy. (*Id.* at 275-81) Dr. Falco's January 17, 2007 progress note reports that "Dr. Kupcha saw no tear on the MRI [of the knee] but did reveal cartilage disruption." (*Id.* at 664) Dr. Falco's August 27, 2007 progress note described Saragino's July 2007 CT of the cervical spine, which demonstrated "tiny C2/3, C3/4 and C4/5 disc protrusions, C5/6 and C6/7 central and left paracentral disc protrusions, C3/4 to C6/7 facet arthropathy, generalized disc space narrowing [and] loss of cervical lordosis with straightening of the cervical spine[.]" (*Id.* at 641) Dr. Falco conducted an EMG of Saragino's upper left extremity on October 3, 2007 which was abnormal, revealing left C6 motor radiculopathy, (*id.* at 625-26), results that were reiterated in his November 21, 2007 progress note, (*id.* at 623). By July 7, 2008, Saragino was complaining of increased pain, and Dr. Falco's progress note referred to June 26, 2008 MRIs of the knees, describing the image of the left knee as showing meniscal tear, large effusion, a prominent popliteal cyst, and extensive debris within the effusion and cyst. (*Id.* at 592-93) The MRI of the right knee showed a large effusion, popliteal cysts, and extensive debris therein. (*Id.*

of "peripatellar synovial reaction" in Saragino's knees, left greater than right)).

at 593) On June 8, 2009, Dr. Falco indicated that Saragino's DEXA scan indicated areas of osteopenia. (*Id.* at 739) And while Dr. Falco's March 8, 2010 letter describing Saragino's diagnoses and limitations does not explicitly refer to any clinical findings or objective tests, the ALJ noted that this assessment was consistent with Dr. Falco's prior November 24, 2008 RFC assessment—an assessment that did identify "MRI, EMG, bone scan" as the clinical findings and objective signs supporting Dr. Falco's opinions. (*Id.* at 25, 502, 744)

Third, while the ALJ faulted Dr. Falco for his "diligent[]" reliance on Saragino's subjective complaints of chronic, intense pain, (Tr. at 31-32), these complaints are consistent throughout the entire record and are consistent with Saragino's diagnoses. If objective medical evidence demonstrates that a claimant has a condition that could reasonably produce the pain the claimant describes, the claimant is not required to produce objective evidence of the pain itself. *Tucker v. Colvin*, — F. Supp. 3d — , C.A. No. 13-01246-LPS, 2015 WL 4592073, at *11 (D. Del. July 30, 2015); *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 662 (D. Del. 2008). And here, the ALJ concluded that Saragino suffers from severe conditions, (Tr. at 23), which are consistent with the pain she describes feeling. For example, the ALJ found that Saragino suffered from RSD of the left knee, a diagnosis that "requires the presence of complaints of persistent, intense pain that results in impaired mobility of the affected region." *Tucker*, 2015 WL 4592073, at *11 (quoting SSR 03-2P).[21] Notably, never in the course of Saragino's extensive medical

---

[21]     The ALJ takes issue with the fact that Dr. Falco listed in his March 2010 assessment diagnoses of joint pain in the shoulder, backache, and lower extremity joint pain, asserting that "'pain' is not an impairment[.]" (Tr. at 32) But these were not the whole of Dr. Falco's diagnoses. He also noted diagnoses of, *inter alia*, RSD and rheumatoid arthritis, conditions associated with pain. (*Id.* at 744 (indicating that Saragino was being seen for, *inter alia*, "337.22" and "714.0" which are diagnostic codes standing for RSD and rheumatoid arthritis)); *see* http://www.icd9data.com/2015/Volume1/320-389/330-337/337/337.22.htm (last

history—covering innumerable physician visits and a vast array of described physical and mental setbacks—did any of her treating physicians express disbelief in Saragino's account of her symptoms. Indeed, Dr. Falco (and other treating physicians) provided extensive treatment to Saragino for pain, including multiple nerve blocks, epidural injections, aspirations, an ablation, and numerous prescriptions for pain medications. (*See, e.g.*, Tr. at 235-37, 245-47, 272-73, 292-94, 302-07, 571-74, 581, 611-12, 618-19, 629, 639, 643, 708, 731, 734-36, 742)

Fourth, in support of her decision to afford Dr. Falco's opinion "little weight," the ALJ asserts that "[t]he record further demonstrates that . . . Dr[]. Falco provid[es] the claimant with whatever medication, prescription, or paperwork she requests." (*Id.* at 32) This is a serious allegation, but it is supported by no citation to the record. (*Id.*) While certain of Dr. Falco's progress notes indicate that he would adjust Saragino's medication as necessary because particular medications or dosages made her tired, failed to effectively relieve pain, or hindered her ability to care for her children, (*see, e.g.*, *id.* at 575, 580, 592-94, 616-17), that is hardly surprising, given his role as her pain management specialist.[22]

---

visited Sept. 29, 2015);
http://www.icd9data.com/2015/Volume1/710-739/710-719/714/714.0.htm (last visited Sept. 29, 2015).

[22]    It is notable that in this same paragraph of her opinion, the ALJ reveals a mistaken reading of the record, asserting that "[t]he record demonstrates that on January 6, 2006, after only one visit to the professionals of First State Orthopaedics, the claimant telephone[d] their office to request a 'note for work.'" (Tr. at 32) This sentence appears to have been meant to similarly suggest a treatment regime in which Saragino's physicians simply provided her with whatever she asked for, regardless of the physicians' knowledge of Saragino's conditions or the length of her treatment relationship. What the record actually demonstrates, however, is that Saragino first visited First State in 1989—nearly *two decades* prior to this January 2006 request. (*Id.* at 477-501) In those intervening years, Saragino had in fact returned for numerous visits to the physicians at First State. (*Id.* at 477-501) Indeed, in the referenced record—in which it is recorded that Saragino asked for a "note for work"—it is also written that the First State

Fifth and finally, it is not clear at all from the ALJ's discussion that she considered any of the following factors before deciding to give Dr. Falco's opinion "little weight": the length of Dr. Falco's treatment relationship with Saragino, the frequency of his examinations (aside from a reference to Dr. Falco's "voluminous treatment records"), the nature and extent of the treatment relationship, and the level of knowledge Dr. Falco has about Saragino's impairments. (D.I. 12 at 15) Dr. Falco is a certified pain medicine physician, (*id.* at 4 n.1; Tr. at 25), who had treated Saragino for over four years by the time of the administrative hearing, and who had seen her on innumerable occasions in that time period. The ALJ is required to provide analysis of these factors in deciding what weight to assign Dr. Falco's opinion. *See* 20 C.F.R. § 404.1527(c). Were these factors truly considered, it is difficult to believe that they each would not militate in favor of crediting Dr. Falco's opinion to a greater degree than that allowed for in the ALJ's decision.

For all of these reasons, the ALJ's decision to give Dr. Falco's opinion "little weight" is unsupported by substantial evidence. *See Ludlam v. Colvin*, Civil Action No. 14-988-RGA/MPT, 2015 WL 4966371, at *12-13 (D. Del. Aug. 20, 2015) (finding that ALJ's decision to afford "little weight" to a treating physician's opinion that the plaintiff could not perform sedentary work was error—despite his findings of normal muscle strength—where the physician, a pain management specialist, relied on objective testing in reaching his conclusions and repeatedly documented plaintiff's intense pain and his treatments thereof); *Tucker*, 2015 WL 4592073, at *10-13 (ALJ's decision to afford "little weight" to treating physician's opinions was not supported by substantial evidence where the ALJ (1) failed to balance the factors set out in 20

---

physician who provided that note "has seen" Saragino in the past. (*Id.* at 480)

C.F.R. § 404.1527(c); and (2) "faulted [the claimant's] treating physician[] for relying too

heavily on [her] subjective complaints of pain" in forming his medical opinion, when her

complaints were consistent throughout her medical history and consistent with her diagnosis of

complex regional pain syndrome and RSD).

### b. Dr. Yezdani

Dr. Yezdani, Saragino's primary care physician for a decade by the time of the

administrative hearing, (D.I. 12 at 15), provided a February 2, 2010 assessment in which he

opined that Saragino was essentially wheelchair bound and had significant other limitations, (Tr.

at 743). Thus, as described above with respect to Dr. Falco, the manner in which the ALJ

reviewed and considered Dr. Yezdani's opinion is likewise significant. The ALJ accorded "little

weight" to Dr. Yezdani's opinion. The ALJ's decision to do so was also not supported by

substantial evidence.

With respect to Dr. Yezdani's opinion, the ALJ stated that:

> Dr. Yezdani's treatment records are generally illegible; thus, it is
> difficult to determine whether h[is] prescription of a wheelchair to
> the claimant 2 days after the claimant's automobile accident is
> consistent with h[is] own treatment records; however, no other
> medical or opinion evidence of record supports a finding that the
> device is medically required.

(*Id.* at 32) The ALJ was clearly wrong in stating that no other medical evidence supports a

finding that Saragino's wheelchair was medically required. As Saragino points out, (D.I. 16 at

3), Dr. Falco confirmed Saragino's need for a wheelchair in his March 8, 2010 report, (Tr. at 744

("The patient . . . needs to have a wheelchair to ambulate" after walking with a cane for ten

minutes. )). Indeed, even the examining state agency physician Dr. Lifrak reached this

conclusion. (*Id.* at 421 ("[I]t is my considered medical opinion that within an 8-hour day this individual is essentially wheelchair-bound[.]"))

As for the ALJ's initial statement in the quoted passage, the Court notes that "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Carmichael v. Barnhart*, 104 F. App'x 803, 805 (3d Cir. 2004); *see also* 20 C.F.R. § 404.1512(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application[.]"). If the ALJ was unable to read Dr. Yezdani's notes and had any question as to whether those notes were consistent with Dr. Yezdani's wheelchair prescription, then pursuant to 20 C.F.R. § 404.1512(d), the ALJ bore a duty to further develop the record to obtain clarity on that issue. *See, e.g., Smith v. Astrue*, No. ED CV 08-1131-PLA, 2009 WL 1653032, at *6 (C.D. Cal. June 10, 2009); *Berrios-Vasquez v. Massanari*, No. CIV. A. 00-CV-2713, 2001 WL 868666, at *6 (E.D. Pa. May 10, 2001).

In reaching the faulty conclusion that no other record evidence supported Saragino's need for a wheelchair, the ALJ also appeared to suggest that Dr. Yezdani's opinion was inconsistent with that of Saragino's rheumatology specialist, Dr. Cowdery (who had begun treating Saragino a mere month before the administrative hearing). (Tr. at 32; *see also* D.I. 15 at 21) The ALJ's assertion in this regard was also incorrect. Dr. Cowdery does not opine anywhere in her treatment notes that Saragino does not require a wheelchair. (*Id.* at 745-78) Indeed, in her March 12, 2010 note, Dr. Cowdery notes "[l]evel of function: wheelchair for travel and requires help with [activities of daily living]." (*Id.* at 748) The ALJ cites only to certain of Dr. Cowdery's clinical findings during Saragino's initial February 8, 2010 consultation as

53

supposedly being inconsistent with Dr. Yezdani's opinion, but the ALJ does not explain why she interprets these findings as supporting the conclusion that Saragino's wheelchair was not medically required. (*Id.* at 31) The Court notes that Dr. Cowdery's findings during this visit were not normal with respect to Saragino's knees—Dr. Cowdery noted left greater than right "peripatellar fullness, synovial thickening, crepitus, and pain with range of motion." (*Id.* at 776)[23]

As an additional reason for discounting Dr. Yezdani's opinion, the ALJ (as she did with Dr. Falco) stated that "[t]he record [] demonstrates that . . . Dr.[] Yezdani provide[s] the claimant with whatever medication, prescription, or paperwork she requests." (*Id.* at 32) The ALJ again provides no citation to the record in support of this accusation, and the very next line of the ALJ's opinion is the one indicating that "Dr. Yezdani's treatment records are generally illegible[.]" (*Id.*) It is difficult to understand how the ALJ could determine that Dr. Yezdani had essentially outsourced the exercise of his independent medical judgment to Saragino, when the ALJ could not even decipher Dr. Yezdani's medical records in the first place. This accusation too is unsupported by substantial evidence.

The Court finally notes that, similar to her assessment of Dr. Falco's opinion, the ALJ failed to address many of the factors set out in Section 404.1527(c) in deciding to give Dr. Yezdani's opinion "little weight." (D.I. 12 at 15) The ALJ is required to provide analysis of these factors in deciding what weight to assign Dr. Yezdani's opinion. 20 C.F.R. § 404.1527(c).

For all of these reasons, the Court finds that the ALJ's decision to give the opinion of Dr.

---

[23]     In a follow-up visit a few weeks later, Dr. Cowdery observed "peripatellar synovial reaction" in the knees, left greater than right. (Tr. at 756)

Yezdani "little weight" is unsupported by substantial evidence.

### c.    Dr. Borek

In addition to her argument that the ALJ gave too little weight to the treating physicians'

opinions, Saragino argues that the ALJ improperly gave too much weight to the April 2009

opinion of the non-examining state agency physician, Dr. Borek. (D.I. 12 at 14-15) In Dr.

Borek's opinion, "the evidence 'does not support [the] claimant's need for a wheelchair'"; due in

significant part to this finding, Dr. Borek found the evidence to support a sedentary RFC. (Tr. at

33 (quoting *id.* at 675)) The ALJ assigned "significant weight" to Dr. Borek's opinion in finding

that Saragino had an RFC that would allow her to perform sedentary work. (*Id.* at 33-34)

In asserting error here, Saragino contends that Dr. Borek "mistakenly considered medical

evidence prior to her July 2007 auto accident to reach the conclusion that she did not need to use

a wheelchair after July 2007[.]" (D.I. 16 at 8; *see also* D.I. 12 at 2, 14-15) Saragino is correct.

Saragino's auto accident occurred on July 10, 2007, (Tr. at 390, 516), and Dr. Yezdani

prescribed Saragino a wheelchair two days later, (*id.* at 414-16). In his April 2009 opinion, Dr.

Borek summarizes a number of Saragino's treatment records spanning the time period from

December 2005 through January 2009. (*Id.* at 674-75) In concluding that "[t]he evidence does

not support the claimant's need for wheelchair," (*id.* at 675), Dr. Borek explains:

> The patient is only partially credible, on 3/27/07 Dr. Falco notes,
> the claimant presented in wheelchair, gait was antalgic, walks with
> crutches, MMT decreased strength upper and lower. However
> 3/12/07 Meadowood admission, no mention of inability to walk,
> she arrived with no shoes. Meadowood's initial assessment it was
> noted that she was independent with all ADLs, normal motor
> activity.

(*Id.*)[24] Thus, it is clear that Dr. Borek relied on a medical record generated four months before Dr. Yezdani prescribed Saragino's wheelchair, in order to conclude that Saragino did not need a wheelchair. (*See id.*; *see also id* at 672)[25] In every single medical record Dr. Borek cites that was generated after the July 2007 car accident (records from doctor's visits in January 2008, March 2008, September 2008, and January 2009), the physician at issue notes that Saragino was in fact using a wheelchair at the time. (*Id.* at 675)

The weight accorded to the opinions of non-treating physicians is to "depend on the degree to which they provide supporting explanations for their opinions" after "consider[ing] all of the pertinent evidence[.]" 20 C.F.R. § 416.927(c)(3). The only piece of evidence that Dr. Borek relied upon in opining that the record failed to support Saragino's need for a wheelchair is completely irrelevant. And because that finding (that Saragino was not credible in asserting the need for a wheelchair) was clearly a significant factor in Dr. Borek's ultimate "sedentary RFC" conclusion, the ALJ thus erred in assigning Dr. Borek's opinion "substantial weight." What

---

24      The Court notes that there are no treatment notes from Dr. Falco regarding a March 27, 2007 visit. Saragino did visit Mid-Atlantic Spine the day before, on March 26, but the progress note in the record from that visit does not reference any "wheelchair." (Tr. at 662-63)

25      Dr. Borek may have overlooked the fact of the July 2007 auto accident (and its impact on Saragino's need for a wheelchair) due to another mistake in his report. In Dr. Borek's report, he summarizes Dr. Lifrak's December 2007 physical evaluation, noting that Saragino presented to Dr. Lifrak "in [a] wheel chair, she reports to first have difficulties in 1996 following a traumatic injury. Then *in 1997* she was involved in MVA [motor vehicle accident], since that time she has needed a wheelchair virtually at all times." (Tr. at 675 (emphasis added)) However, a review of Dr. Lifrak's actual report indicates that Dr. Lifrak explained that it was the motor vehicle accident in "July 2007" that had prompted Saragino to need to "use[] a wheelchair virtually at all times." (*Id.* at 417) Had Dr. Borek correctly transcribed the date of this auto accident in his report, it may have then been more understandable why Saragino's status at the time of her *March 2007* MeadowWood admission would not have been probative when assessing Saragino's need for a wheelchair by the time of the December 2007 meeting with Dr. Lifrak.

56

weight the opinion should be given should be reassessed in light of the above.

### d. The appropriate remedy in light of the ALJ's errors in considering the treating and non-treating physicians' opinions

Saragino argues that "[t]he opinions of Dr. Falco and Dr. Yezdani, together with the testimony of the VE, establishes that Ms. Saragino is disabled as defined by the Act." (D.I. 12 at 18-20) Accordingly, she asserts that the Court should vacate the ALJ's decision and simply enter an order for an award of benefits, rather than remand for further proceedings. (*Id.*; D.I. 16 at 10) The Third Circuit has held that a district court's decision to direct benefits where an ALJ has committed error "should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984).

The Court recommends that the case be remanded to the ALJ for further consideration consistent with the decision in this subsection, and that benefits not be directed at this stage. Although Saragino does appear to have a strong case for receipt of benefits, her medical history is lengthy and multifaceted, and the record is not entirely one-sided. For example, even were Dr. Borek to have been wrong, and were Saragino to have essentially required the use of a wheelchair during the time period in question, that would not end the inquiry, as the VE testified that simply being confined to a wheelchair would not preclude all sedentary work. (Tr. at 829) Moreover, in addition to Dr. Borek, another non-treating physician (Dr. Palandjian) opined that Saragino's physical limitations were not severe enough to preclude her from sedentary work. (Tr. at 33) And the fact finder's view of the treating physician's opinions—after considering the content of the District Court's decision and all of the factors set out in 20 C.F.R. §

57

404.1527(c)—will also play an important role here. For all of these reasons, the Court declines to recommend an award of benefits at this stage. *See, e.g., Morris v. Astrue*, Civ. Action No. 10-414-LPS-CJB, 2012 WL 769479, at *25 (D. Del. Mar. 9, 2012); *Ongay v. Astrue*, Civil No. 09-0610 RMB, 2010 WL 5463070, at *11 (D. Del. Dec. 29, 2010).

### 4. The ALJ's assessment of Saragino's credibility and her RFC

Saragino additionally argues that (1) the ALJ failed to properly evaluate her credibility; and (2) the RFC was deficient because it did not include certain established limitations. (D.I. 12 at 16-18; D.I. 16 at 7-9) As described above, the ALJ erred in reaching her disability determination by failing to follow the treating physician rule in assessing the various medical opinions of record. Because the Court recommends that this matter be remanded on those grounds, it is very possible that, on remand, the ALJ may reach different conclusions as to Saragino's credibility, her impairments, and her RFC. *See, e.g., Stokes v. Colvin*, Civil Action No. 13-1479-RGA, 2014 WL 6783742, at *8 (D. Del. Nov. 26, 2014); *Goins v. Colvin*, 64 F. Supp. 3d 581, 602 n.33 (D. Del. 2014). Accordingly, the Court only addresses here Saragino's argument that the ALJ failed to properly and fully consider limitations stemming from her mental condition, as that argument is not directly implicated by the ALJ's errors in assessing the medical opinions of Dr. Falco, Dr. Yezdani, and Dr. Borek.

On March 15, 2007, at the time of Saragino's discharge from MeadowWood, Saragino's GAF was a 50. (Tr. at 343-45) The ALJ references this stay at MeadowWood in her opinion, noting the GAF score and stating that "a GAF of 50 generally reflects moderate psychological symptomatology, primarily manifest in the realm of social functioning." (*Id.* at 23) Ultimately, the ALJ concluded that Saragino's depression/anxiety is a severe impairment, (*id.*), and in

58

fashioning the RFC, found that "the claimant has the mental [RFC] to perform simple, routine, unskilled non production pace work that requires no more than an occasional need to make decisions and no more than an occasional use of independent judgment[,]" (*id.* at 34).

The GAF scale is "a metric used by the American Psychiatric Association to assess an individual's psychological, social and occupational functioning." *Loeb v. Colvin,* — F. Supp. 3d —, Civ. No. 14-1120-SLR, 2015 WL 5442813, at *1 n.3 (D. Del. Sept. 16, 2015) (internal quotation marks and citation omitted). The scale ranges from 1 to 100, with a score of one representing the lowest ability to function and a score of 100 being the highest. *Mathis v. Astrue,* Civil Action No. 12-858-GMS, 2014 WL 7149465, at *1 n.1 (D. Del. Dec. 12, 2014).

Saragino argues that the ALJ's mental RFC did not sufficiently consider the limitations stemming from her mental condition. (D.I. 12 at 18) She elaborates with a single sentence: "[s]pecifically, the ALJ mistakenly stated that a GAF of 50 represents only moderate symptoms[,] (Tr. [at] 23), while it actually represents serious functional limitations[,]" (D.I. 12 at 18).

Saragino is correct that the ALJ's characterization of a GAF score of 50 was not wholly accurate. A GAF score of 41-50 demonstrates an individual has "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Rios v. Comm'r of Soc. Sec.,* 444 F. App'x 532, 534 n.3 (3d Cir. 2011). A score between 51 and 60 indicates "either moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Loeb,* 2015 WL 5442813, at *1 n.3 (internal quotation

marks and citation omitted).[26] Thus, a score of 50 "falls on the border of moderate to serious impairment of functioning." *Mathis*, 2014 WL 7149465, at *1 n.1 (citing *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text. rev. 2000)).

However, the Court concludes that given the totality of the evidence, the ALJ's evaluation of Saragino's mental functioning is supported by substantial evidence. A GAF score does not have a "direct correlation to the severity requirements" of the Social Security mental disorder listings. Revised Medical Criteria for Evaluating Medical Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746-01, 50764-65 (Aug. 21, 2000). Rather, a GAF score is only medical evidence that informs the Commissioner's judgment of whether an individual is disabled. *Rios*, 444 F. App'x at 535. While an ALJ should consider a GAF score in assessing a claimant's RFC, the score, standing alone, does not necessarily evidence an impairment that seriously interferes with a claimant's ability to work (since it may indicate problems that do not relate to the ability to hold a job). *Keller-Price v. Colvin*, Civil Action No. 13-1117, 2014 WL 4925078, at *5 (W.D. Pa. Sept. 30, 2014). While a GAF score may be helpful to the ALJ in understanding the limitations contained in the opinions of medical professionals, the actual score itself does little to describe the specific functional limitations stemming from the claimant's impairments. *Id.*

Here, substantial evidence supports the ALJ's conclusion that "[Plaintiff] has the mental [RFC] to perform simple, routine, unskilled non production pace work that requires no more than

---

[26]     A score of 61-70, meanwhile, indicates "some mild symptoms (e.g., depressed mood and mild insomnia) *or* some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Mathis*, 2014 WL 7149465, at *2 n.3 (citation omitted).

an occasional need to make decisions and no more than occasional use of independent judgment." (Tr. at 34) In coming to this conclusion, the ALJ largely relied on the findings of Dr. Kurz, a state agency psychological consultant, who examined Saragino in January 2008 (after Saragino's stay at MeadowWood). (*Id.*) During the examination, Dr. Kurz observed that Saragino's language skills were intact, that she was able to follow directions, and her higher cognitive skills were intact. (*Id.* at 428) He diagnosed Saragino with a GAF of 63. (*Id.*) While the ALJ did not explicitly reference this GAF score in her decision, she implicitly did so when noting that "Dr. Kurz concluded that the claimant's [mental condition] caused mild to moderate limitations in the claimant's work-related mental abilities." (*Id.* at 34 (citing 426-32)) In assessing Saragino's mental RFC, the ALJ also relied on the fact that the whole of Saragino's mental health treatment amounted to the one 72-hour stay at MeadowWood and one follow-up evaluation. (*Id.*) And in the absence of any treating source opinion on the issue, the ALJ additionally considered the conclusions of the non-examining state agency consultants; those consultants agreed with Dr. Kurz that Saragino demonstrated the ability to follow instructions, get along with others, and perform simple routine, low-stress work. (*Id.* at 34 (citing *id.* at 433-43, 444-46, 535-37, 538-48))[27]

In sum, regardless of how the ALJ characterized Saragino's GAF score of 50, it is clear that the ALJ's conclusions regarding mental-health-related limitations were not based on this one score alone. Instead, they were based on the entire record, and were supported by substantial

---

[27]     The ALJ considered Saragino's own testimony as well, wherein she indicated that with medication, the symptoms arising out of her mental condition were generally in control, and she did not presently feel the need to return to see a mental health doctor. (Tr. at 23; *see also id.* at 815)

record evidence.

### 5.     Post-Hearing Evidence

Following the ALJ's April 26, 2010 decision, Saragino submitted additional evidence to

the Appeals Council. (D.I. 12 at 1)  These additional records consist of the following:

(1)     A September 10, 2010 operative report from Alex Bodenstab, M.D. regarding
Saragino's left knee arthroscopy.  The "Indications for Surgery" section of the
report noted that Saragino was experiencing "increasingly severe pain and
swelling in her left knee."  A review of Saragino's x-rays was most consistent
with an inflammatory arthritis such as rheumatoid arthritis, and revealed complete
loss of the weight bearing joint space in both the medial and lateral compartments.
Dr. Bodenstab indicated that Saragino would ultimately need knee arthroplasty
after he was able to confirm that there was no infection in the knee.  During the
arthroscopic procedure, he noted "substantial degeneration of particularly the
lateral meniscus."  (*Id.* at 792-94)

(2)     A November 1, 2010 operative note from Dr. Bodenstab regarding Saragino's
total left knee arthroplasty.  He indicated that Saragino had a "number of medical
problems including rheumatoid arthritis and chronic pain syndrome[,]"
particularly involving severe pain in her left knee.  X-rays show "severe
destruction of the weightbearing compartments of the joint."  (*Id.* at 795-98)

(3)     Records from Mid-Atlantic Spine covering the period from April 11, 2011 to June
6, 2011.  On April 11 and May 9, Saragino complained of worsening RSD in her
left knee since her November 2010 knee replacement, increased joint pain in all
joints, and persistent headaches. (*Id.* at 782, 789)  She reported that her current
medications provided 45% relief.  (*Id.*)  A June 6, 2011 note was largely similar,
additionally reporting that Dr. Cowdery had diagnosed Saragino with
fibromyalgia. (*Id.* at 786)  By this visit, Saragino's pain medications were
providing only 30% relief.  (*Id.*)

The Third Circuit has held that in circumstances when the Appeals Council has denied

review of an ALJ's decision, and when a claimant later seeks to rely on evidence that was not

before the ALJ, a district court may not consider that evidence in evaluating whether the ALJ's

decision was based on substantial evidence. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir.

2001); *Matthias v. Colvin*, Civ. No. 12-1203-LPS, 2015 WL 1191281, at *13 (D. Del. Mar. 13,

2015). Instead, pursuant to sentence six of 42 U.S.C. § 405(g), the Court may order a remand to the Commissioner (a "sentence six remand") for consideration of the evidence, but only if the following test is satisfied: (1) the evidence is new; (2) the evidence is material; and (3) there is good cause why the evidence was not previously presented to the ALJ. *See Matthews*, 239 F.3d at 593; *Matthias*, 2015 WL 1191281, at *13. The plaintiff bears the burden of establishing each of these elements. *See Matthews*, 239 F.3d at 595; *Fegley v. Colvin*, No. 3:13-cv-01760, 2015 WL 1636045, at *3 (M.D. Pa. Apr. 8, 2015).[28]

Because the evidence at issue post-dates the administrative hearing (and the ALJ's decision), it is clear and undisputed that it is "new" and could not have been presented at the hearing. *Szubak v. Sec'y of Health & Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984). The decision here turns on whether the evidence is material. For evidence to be "material," it must "relate to the time period for which the benefits were denied, and . . . not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Hardee v. Comm'r of Soc. Sec.*, 188 F. App'x 127, 130 (3d Cir. 2006) (quoting *Szubak*, 745 F.2d at 833); *see also Matthias*, 2015 WL 1191281, at *13.[29]

---

[28]    At least one district court in the Third Circuit has noted that sentence six remands are "unusual." *Shields v. Colvin*, Civil No. 3:13-CV-1807, 2014 WL 4384693, at *1 (M.D. Pa. Sept. 4, 2014); *cf. Lopacinski v. Barnhart*, No. CIV.A. 01-4364, 2003 WL 1962302, at *5 n.10 (E.D. Pa. Apr. 21, 2003) (acknowledging the "legislature's choice to drastically limit remand based on additional evidence").

[29]    In *Szubak v. Sec. of Health & Human Servs.*, 745 F.2d 831 (3d Cir. 1984)—the earliest Third Circuit case stating that in order to be "material," evidence may not reflect a subsequent deterioration of the previously non-disabling condition—the Court cites solely to a decision from the United States Court of Appeals from the Ninth Circuit in support of this proposition. *Szubak*, 745 F.2d at 833 (citing *Ward v. Schweiker*, 686 F.2d 762, 765 (9th Cir. 1982)). In granting the claimant's request for sentence six remand, the *Szubak* Court did not itself discuss why the new evidence before it did not merely reflect a subsequent deterioration.

While this presents a close case, in the end, the Court must conclude that Saragino's

evidence does not meet the materiality requirement. When evaluating whether new evidence

indicates a "subsequent deterioration" of the claimant's condition, courts must assess whether the

records at issue "suggest that [the claimant's] condition had reached this stage on or before the

date of the hearing before the ALJ." *Hardee*, 188 F. App'x at 130; *see also Milano v. Comm'r of

Soc. Sec.*, 152 F. App'x 166, 171 (3d Cir. 2005). Nothing in the additional evidence presented

here indicates that Saragino's condition had reached the stage described therein at the time of the

administrative hearing.[30]

---

However, the *Ward* Court, in analyzing this issue, looked for some articulation in the new
evidence that the condition related back to the relevant time period. In that case, the Social
Security Administration had awarded benefits to the claimant for the period of time from October
1973 until May 1975, but determined that her disability had ceased by the latter date. *Ward*, 686
F.2d at 763. In February 1980, the claimant was diagnosed with a condition known as
myasthenia gravis, and her treating physician explained that she had "suffered from 'ongoing
disease over several years at least prior to February admission.'" *Id.* The claimant requested a
sentence six remand pursuant to the new medical evidence. *Id.* The Court denied the request,
noting that the claimant would be required to show that she had the condition for almost five
years before it was diagnosed in 1980, but the "medical evidence offered by [the claimant]
contains no findings that she suffered from [the condition] during the period of coverage[,]" and
she did not "suppl[y] any indication that she will be able to make such a showing if given the
opportunity to present additional evidence to the Secretary." *Id.* at 765.

In contrast, in *Shields v. Colvin*, Civil No. 3:13-CV-1807, 2014 WL 4384693 (M.D. Pa.
Sept. 4, 2014), one of the few cases in this Circuit in which sentence six remand has been
granted, the Court found a link between the new evidence and the relevant time period. In
*Shields*, the Court noted that the claimant's post-hearing amputation of his right leg below the
knee could not simply be dismissed as evidence of subsequent deterioration. There, however, the
claimant's doctor had issued a report (in January 2012, the same month as the administrative
hearing, and months prior to the ALJ's decision) that indicated that the severe chronic foot pain
that "led to" the decision to amputate the claimant's foot had "continued unabated since 2005."
*Shields*, 2014 WL 4385693, at *2, *5. Thus, this report was said to "expressly tie[] this new
medical development [the amputation] to [the claimant's] longstanding foot injury." *Id.* at *5.

[30]     The materiality standard also "requires that there be a reasonable possibility that
the new evidence would have changed the outcome of the Secretary's determination[.]" *Szubak*,

64

Before turning to those records, the Court acknowledges that in the time period leading up to the hearing, the record does indicate ongoing problems with Saragino's left knee. For instance, a June 2008 MRI of the left knee revealed a large effusion of the knee joint, a prominent popliteal cyst, and extensive debris. (Tr. at 460) Following arthroscopy on her right knee, on September 4, 2008, Dr. Newcomb reported that Saragino had "similar" complaints in her left knee that could be addressed if the surgery resolved her right knee symptoms. (*Id.* at 465) Later that month, Saragino informed Dr. Irwin that she was hoping to schedule a left knee arthroscopy, (*id.* at 575), and in November 2008, she reported to Dr. Falco that undergoing a diagnostic video arthroscopy of the knee was a possibility as it "continues to be painful and swells[,]" (*id.* at 565). A June 2009 bone scan of her knees apparently indicated "areas of osteopenia." (*Id.* at 739) In February 2010, Dr. Cowdery unsuccessfully attempted to aspirate Saragino's left knee, after which Saragino remarked that such attempts were never successful and that she had been advised by her doctor that she "'need[ed] surgery to clean [the left knee] out.'" (*Id.* at 777) And at the March 11, 2010 administrative hearing, Saragino testified that her left knee was "still severely swollen[,]" that it had "gotten bigger" and that her physician told her that

---

745 F.2d at 833. The burden to demonstrate such a reasonable possibility is "not great"; it requires more than a minimal showing, but that showing "need not meet a preponderance test." *Newhouse v. Heckler*, 753 F.2d 283, 287 (3d Cir. 1985). The Commissioner argues that sentence six remand is not justified here because the new evidence fails to meet this requirement, describing Saragino's post-surgery findings as "benign[.]" (D.I. 15 at 12 n.3) Mindful that the burden here is not daunting, the Court is unpersuaded that Saragino's new evidence fails to satisfy this portion of the materiality standard. For one, the Commissioner's argument overlooks Dr. Bodenstab's reports describing the content of Saragino's x-rays and her total knee replacement surgery, which certainly do not amount to "benign" conditions. This argument also overlooks much of the content of the post-surgery records which indicate, for example, that Saragino was then experiencing "intractable" pain in her back, both knees, neck and left arm, and that her "left knee has had worsening RSD[.]" (Tr. at 782)

"it's a rheumatoid knee, and they're not going to get anything out of it by trying to drain it, but surgery might be able to get some of the fluid out." (*Id.* at 813)

Turning to the new records at issue, however, there is no strong indication that the condition reflected therein was also present at the time of the hearing before the ALJ. As an initial matter, there is a gap of six months between the date of the hearing and the earliest of the new records (Dr. Bodenstab's September 10, 2010 operative report). (*Id.* at 792) Although it is clear that Saragino underwent treatment during this six-month time period, (*see, e.g., id.* (indicating that she was seen by an orthopedic doctor "earlier this summer")), records of this treatment were not submitted, and so the Court has no indication of Saragino's complaints, condition, or treatment during this half-year stretch.

Furthermore, nothing in these new records explicitly indicates (or even hints) that Saragino's knee condition in September and November 2010 was comparable to what it had been in March of that year. Indeed, Dr. Bodenstab's September 10, 2010 report states that Saragino presented with "*increasingly* severe pain and swelling in her left knee"—a rather strong indication that her condition had not remained the same, but instead had become significantly worse. (*Id.* (emphasis added); *see also id.* at 795 (Dr. Bodenstab's November 1, 2010 operative note stating that Saragino "*has developed severe pain* in her left knee") (emphasis added)) Dr. Bodenstab's operative reports document x-rays of the left knee that reflected a "complete loss of the weightbearing joint space in both the medial and lateral compartments[,]" but the date of these x-rays, which themselves are not in the record, remains a mystery; they could have been taken the day after the administrative hearing or they could have been taken months later in September 2010. (*Id.* at 792; *see also id.* at 795 (Dr. Bodenstab's November 1, 2010 note

referring to "[x]-rays show[ing] severe destruction of the weightbearing compartments of the joint" but giving no indication of the date of the x-rays)) Generally, "testing and evaluations performed months after the relevant time period . . . do not justify [sentence six] remand." *Fegley*, 2015 WL 1636045, at *4 (citing cases).

Saragino argues that the complete loss of weight bearing joint space in her left knee referenced in the September 10, 2010 note "did not occur just subsequent to the ALJ's decision." (D.I. 16 at 10) The record, however, gives no indication of how rapidly this type of condition can occur. It might be that, as Saragino asserts, "[i]t took years for [Saragino's] left knee to degenerate to the point that she needed to have her knee replaced at the age of only 36." (*Id*) But there is nothing in the proffered new evidence to suggest that Saragino had in fact developed a complete loss of the weight bearing joint space in her left knee (or something close to that condition) on or before the date of the administrative hearing. Instead, as noted above, what evidence there is suggests that she had not. *See Hardee*, 188 F. App'x at 130 (denying sentence six remand where the hospital reports at issue were from a period of time three months after the relevant time period and therefore only indicative of a "subsequent deterioration of the previously non-disabling condition" and did not "suggest that [the plaintiff's] condition had reached this stage on or before the date of the hearing before the ALJ"); *Milano*, 152 F. App'x at 171 (declining to grant sentence six remand based on reports and tests prepared between May 2001 to February 2003 that showed a right-sided cervical disc herniation, where the ALJ's decision was issued in April 2001 and, therefore, the new records were "indicative of a 'subsequent deterioration of the previously non-disabling condition'"). The appropriate remedy in such a circumstance is not a remand of the original claim to the ALJ, but instead is the filing of a new

claim for benefits by the claimant. *See, e.g., Matthias*, 2015 WL 1191281, at *13 & n.11; *Coolbaugh v. Colvin*, Civil Action No. 3:12-CV-1889, 2014 WL 4536529, at *16 (M.D. Pa. Sept. 11, 2014).

Because Saragino has not met her burden to demonstrate that the new evidence is material, the Court recommends denial of Saragino's request for remand pursuant to sentence six of 42 U.S.C § 405(g).

## IV. CONCLUSION

For the foregoing reasons, the Court recommends that Saragino's motion for summary judgment be GRANTED-IN-PART, and that the Commissioner's motion for summary judgment be DENIED. The Court further recommends that the case be remanded for further proceedings necessary, consistent with this Report and Recommendation—specifically proceedings addressing the Court's conclusions in Section III.B.3.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987); *see also Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated:  September 30, 2015

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE